### THE RUSSELL NO. 3.
### No. 232.

Circuit Court of Appeals, Second Circuit.

Feb. 10, 1936.

See, also, 7 F.Supp. 812.

Loomis & Ruebush, of New York City (Homer L. Loomis, of New York City, of counsel), for appellant.

Alexander, Ash & Jones, and Bigham, Englar, Jones & Houston, all of New York City (Edward Ash and Andrew J. McElhinney, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This suit was upon a libel in rem in the admiralty to recover for a collision between the elevator Oswego, and the propeller of the steamer Isonzo II, while moored to the north side of a Brooklyn pier. The libel, filed December 12, 1925, alleged that the collision was due to the negligent navigation of the tug Russell No. 3, which had the Oswego in tow; that the tug "permitted the said craft to collide with the stern and propeller of the Italian steamer, with the result that the said propeller and stern and parts adjacent thereto were seriously damaged." The answer, filed April 1, 1926, denied these allegations, but in setting up the claimant's own version concluded as follows: "The 'Russell No. 3' drew the grain elevator clear of the 'Isonzo II' but was unable * * * to prevent her from coming into contact with one of the unprotected propeller blades with the result that some part of said propeller blade was chipped or damaged." After some interlocutory proceedings not necessary to set forth, the case was called for trial on June 1, 1928, and marked "settled," and on June 27th of that year an interlocutory decree was entered on the consent of both parties, adjudging that the libelant should recover of the tug "the damages sustained by the libelant by reason of the matters and things alleged in the libel with interest and costs," and referring the computation of damages to a commissioner. Nothing was done thereafter for nearly five years, except to take the depositions of some members of the steamer's crew in 1931 and 1932. The case was finally moved for trial before the commissioner on May 16, 1933, and an immense amount of testimony was taken during the next five months. The commissioner reported that the propeller and shaft and adjacent parts had not been injured, the contact being confined to the ship's counter; for this reason he allowed only a survey fee. The libelant excepted to this on the ground that the interlocutory decree had foreclosed such a conclusion, and the judge, taking this view, remitted the cause to the commissioner, who thereupon filed a second report, holding that although the contact had been with the propeller, it did no damage; he therefore awarded six cents damages and the same survey fee as before. In reaching this conclusion he accepted the testimony of one of the claimant's witnesses Habig, who said that, standing on the stern of the Oswego just before the collision, he had seen a fluke of the propeller sticking up from the water whose tip had been broken off for about twenty inches. The libelant again excepted, claiming damages not only for a new propeller, but for breaking the cast iron bushing in the tailshaft, the stern tube nut, and loosening some nearby rivets. The judge confirmed the report and the libelant appealed.

The libelant insists that the commissioner even in his second report, although he gave lip service to the decree by finding that the contact was with the propeller, practically proceeded on the opposite assumption. As we understand it, the argument is that he should have disregarded Habig's testimony altogether, because it denied any contact with the propeller which the decree had conclusively established. That he could not use it to compute the quantum of damages arising from a contact which its only rational purport was to contradict; that it could not be serviceable upon an issue which, if it were true, could never arise. Logically this is sound enough if the decree incorporated the allegation of the libel that the Oswego struck the propeller, and it was for that reason that the claimant sought to be relieved from it so that it should read that only the damages, "if any," should be recovered. There was much to be said for granting that relief, and we might feel bound to reverse the order denying it, if anything really turned upon it. However, since we can see, as we shall try to show in a moment, that even though the decree were

amended, the result would be the same, the issue is moot. There is another preliminary matter to be laid aside before we come to the facts. The libelant argues, as we understand it, that having once shown that the propeller was injured, a conclusion following upon the fact of contact, and having then proved in what respects it was in bad condition after the contact, it rested on the claimant to prove what part of the injuries then appearing were not due to the contact. The libelant does not say whether the claimant has the burden of proof or merely the duty to go forward; it relies chiefly on some of our language in The Mason, 249 F. 718, which perhaps gives colorable countenance to its position, though the point was certainly not involved in the decision. We need say no more than that our silence is not to be taken as approving that doctrine, because, as will appear, we think that the libelant has carried the burden of showing that the collision broke a theretofore unbroken fluke; and because as to any other parts, it failed to make a sufficient case even to compel the claimant to go forward, to say nothing of bearing the burden of proof, assuming the supposititious doctrine to exist at all. We proceed to a discussion of the evidence.

■ Although admittedly there was a collision between a tower on the Oswego and the steamer's stern, the only witness who professed to have seen any contact with the propeller was the ship's boatswain, Camerei, who swore that he was standing at the stern of the steamer, as the tug and the Oswego came alongside, and that the Oswego hit the propeller. The claimant persuasively argues that it is very hard to understand how this man could possibly have seen the propeller from where he stood, and we agree with the commissioner that his testimony is substantially worthless. On the other hand, we cannot share the commissioner's reliance upon the testimony of Habig, though he saw him. This man was a member of the Oswego's crew, a marine engineer of long standing though quite illiterate; his testimony is less telling as one reads it than it apparently was when heard; the events were already eight years old; and he had never before told what he saw, although there must have been substantial inquiry of the crew at the time. Still he did say that before the collision he had seen a fluke broken about twenty inches from the top, and that of course presupposed that the injury had already taken place. He stuck to his story, and ordinarily we should feel bound to accept a finding based upon it. Here, however, the other evidence seems to us too plainly to outweigh his testimony. The break could not have happened earlier at that berth, for the steamer had just come in, and besides it is absurd to suppose that she selected the Oswego, if there was another tortfeasor. We are therefore to suppose that it either happened on the way from Naples or before she broke ground at that port. We may eliminate the second possibility; she would scarcely have sailed with a broken propeller from her home port where in all probability it could have been more cheaply replaced than in New York. There remains the chance that it might have been broken by heavy weather, save that five of the seven expert witnesses called by both sides declared that this could not happen. Richardson for the claimant was not examined as to this, and though Ross, for the libelant, did say that it was possible, he stood alone; we feel bound to hold that heavy weather would not have done it. The fluke might indeed have hit a log or some other floating thing; we have no assurance to the contrary except the unanimous denials of the crew, and they may have perjured themselves, but it is most unlikely that they could be mistaken. Such an injury becomes apparent at once in the ship's governance, and would surely be entered in the log; it is incredible that it should be deliberately omitted on the chance of later fastening the loss upon innocent persons. The log for this voyage was not indeed produced before the commissioner; ships' logs apparently have a semiofficial position in Italy, and the master swore that he had left this one with the Italian consul in New York after the collision. The office of the consulate had been changed between that time and the trial, and the log could not be found in the new quarters. Though the consul did not indeed bear out the master in his testimony that the log had been turned over to him, he did not contradict him; on such a showing we should hesitate to impute to the master deliberate perjury. It is still possible that at Boston, New York, or Philadelphia, where the ship touched before she came a second time to New York, the fluke

might have been broken. Yet if this was through the fault of another, we should expect an immediate claim, and in any case there was no reason to delay the repairs, for the ship was not seaworthy as she rode. There is no question that the libelant at once took the position that the collision had broken the fluke; she went to dry dock on the very next day and gave notice of a survey which the claimant attended; the libel was sworn to within a week. All this seems to us to preclude the notion that the case was fabricated to put the injury off upon the claimant. To hold that the testimony of a single witness, like Habig, even though we did not see him and the commissioner did, outweighs this combination of probability, is to give to the finding greater weight than we ought. While it is entitled to be treated as "presumptively correct" (Admiralty Rule 43½, 28 U.S.C.A. following section 723), there is a point after which we must assume responsibility for the facts; we think this is such a situation, and we hold the claimant liable for the break of the fluke requiring a new propeller.

Not so as to the damage to the bushing, the stern tube nut and the rivets. This rests entirely in supposition, and while the experts, or at least some of them, say that a blow upon the fluke might also have injured these parts, they all agree that heavy weather could have done it equally well. Moreover, there is reason to attribute it to earlier wear and tear, because at least the crack in the stern tube nut had become very much corroded. Although it is apparently hard to judge the age of such a break, and indeed the broken edge of the fluke had also corroded, the crack in the stern tube nut had become black and that takes much longer. Even without that, an affirmative finding would be merely a guess. The decree cannot be an estoppel as to these injuries; at most it decided only that damage had been done to "the propeller and the stern and the parts adjacent." That did not fix the adjacent parts which were injured; any parts would do. We affirm the decree as to the bushing, the stern tube nut, the rivets; that is, as to all but the propeller.

The commissioner refused interest beyond a year from the entry of the interlocutory decree, June 27, 1928, because of the extraordinary delay. We are in accord; the initiative is always with the libelant and delays should be on his account, especially where as here they were so extravagant. We need not labor the point that the decree in awarding "interest" did not give the libelant carte blanche to drag on the cause for six or seven years. The appellant will keep its costs in the District Court and have costs in this court; the disbursements in this court will be divided.

Decree reversed, and cause remanded for further proceedings in accordance with the foregoing.