**STEWART et al. v. THE PROTECTOR.**

No. 1346.

United States District Court
E. D. Louisiana, New Orleans Division.

Sept. 23, 1952.

Terriberry, Young, Rault & Carroll, Benjamin W. Yancey, Alfred M. Farrell, Jr., New Orleans, La., for libelants.

Lemle & Kelleher, Selim B. Lemle, New Orleans, La., for George W. Whiteman.

Deutsch, Kerrigan & Stiles, Brunswick G. Deutsch, New Orleans, La., for Hendry Corp.

WRIGHT, District Judge.

This action arises out of a collision between the barge CBC–603 in the tow of the Tug Protector and the barge Fred Driggs in the tow of the Tug Mack. The collision occurred about 9:45 P. M. on July 21, 1946 in the east draw of the Southern Pacific Lines railroad bridge across Berwick Bay from east to west between Morgan City and Berwick, Louisiana. The issues of fact and law having come on to be heard on the pleadings and proofs of the parties and due deliberation having been had, the court now makes the following findings of fact and conclusions of law.

## Findings of Fact

1. The Tug Mack was proceeding southward and downstream in Berwick Bay with three empty tank barges made up in tandem, head log to stern log. Each barge had a length of 180 feet, a beam of 35 feet and a freeboard of approximately 8½ feet. They were being towed astern on bridles and a short hawser so that the forward rake of the lead barge was slightly over the stern of the Mack. The Fred Driggs was the second or middle barge in the tow.

2. The Tug Protector was proceeding northward and upstream in Berwick Bay with four loaded tank barges, each approximately 200 feet long, 40 feet wide, and with a freeboard of 1 foot. The barges were being towed on a 30 foot hawser and 40 foot bridles made fast to the lead barge.

3. At all material times herein involved, both tugs were displaying the proper running and towing lights which were burning brightly. The night was clear with good visibility. The wind was insufficient to affect navigation. The current of 1½ to 2 miles was southward.

4. Some fifteen hundred feet north of the railroad bridge is an automobile highway bridge which also spans Berwick Bay. As the Mack passed under the highway bridge she sounded a three-blast signal to the railroad bridge and reduced speed to half ahead, or about 4 to 4½ miles per hour. The swing span of the railroad bridge was then already in an open position for the passage of vessels. The bridgetender answered the Mack's signal promptly with three blasts, indicating the bridge was open.

5. Shortly thereafter the Tug Protector, which had just come around a bend in the Atchafalaya River into Berwick Bay, some fifteen hundred feet below the railroad bridge, sounded a three-blast signal to the bridge. The Protector's signal was also answered by the bridgetender with a three-blast signal.

6. The bridge opening, which abuts the Berwick side of the waterway, lies in a north-south direction and forms two draws, one on the east, the other on the west side of the span. Each draw is approximately 113 feet wide. The east or left descending draw was at the time of this collision and still is designated as the navigation opening by the United States Corps of Engineers, Department of the Army, and it is used as such by vessels navigating Berwick Bay.

7. Each tug, having received the bridgetender's assent for passage, proceeded to direct its respective course through the east draw. When the Mack was approximately halfway between the automobile and railroad bridges, her captain and pilot sighted the port and mast navigation lights of the Protector as she hove into view from behind and below the stationary center of the swing span of the railroad bridge. As the Protector was navigating diagonally across the bay from the bend in the river to the right ascending side of the east draw at the time, its starboard light was not and could not have been visible to those aboard the Mack. The Mack, on sighting the Protector and not having received a passing signal, immediately sounded a danger signal of four short blasts and reduced her speed to slow ahead. The Mack and her tow were then faired up to make the passage through the east draw.

8. When the Protector did not answer the danger signal, the Mack sounded another such signal and reduced her speed to dead slow ahead. This second danger signal was

immediately answered by the Protector. The Mack was at this time about six hundred feet above the railroad bridge with her tow still faired up for the east draw. It was too late safely to turn to starboard without the tow striking the piling which lined up the draw. Also any attempt at this time on the part of the Mack to stop and reverse engines would have resulted in the tow running down the tug. The Protector, however, being the ascending vessel could have reversed without danger from her own tow.

9. The Mack, at dead slow speed, entered the east draw first with her tow straight astern. She navigated the tow close along the right descending fender of the draw, leaving approximately seventy feet of clear water in the draw for the Protector and her tow.

10. When the Protector entered the east draw, her tow was still not faired up astern. The Mack and her lead barge passed the Protector itself without difficulty. However, the forward starboard corner of the Protector's lead barge struck the draw's right ascending fender and sheered to port across the draw. The forward port corner of the Protector's lead barge then struck the rake under the forward port corner of the Fred Driggs, the Mack's second barge. Because of its low freeboard, the lead barge of the Protector went under the Fred Driggs and the tows remained locked together in the draw.

11. The Mack and the forward one-third of her lead barge had cleared the draw when the collision took place. The point of collision was just below the center pivot pier of the swing span. Immediately prior to the collision the Mack stopped her engine. A few minutes after the collision, the Mack proceeded under dead slow ahead to clear the tows from the draw. They were maneuvered downstream to Bateman Island where they were ultimately separated. Both the Fred Driggs and the Protector's lead barge sustained hull damage.

12. The Captain of the Protector who was at the wheel at the time of the collision died shortly before the trial was held. There were, however, two deckhands and an engineer aboard, none of whom was produced nor accounted for.

### Conclusions of Law

1. This court has jurisdiction over the subject matter of this action and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333.

2. Navigation on Berwick Bay is governed by the Pilot Rules for Western Rivers, Title 33 U.S.C.A. § 301 et seq.; 33 CFR § 332.01 et seq., (1st Edition), and in the circumstances of this case Rule IV applies. 33 CFR § 332.4.

3. 33 CFR § 332.4 provides as follows:

*"Approaching bridge span or draw.* When two steamers are approaching a bridge span or draw from opposite directions and the passing signals as provided in § 332.1 have been given and understood, should the pilot of the descending steamer deem it dangerous for the steamers to pass each other between the piers of such span or draw, he shall sound the alarm or danger signal, and it shall then be the duty of the pilot of the ascending steamer to answer with a similar alarm signal, and to slow or stop his engines below such span or draw until the descending steamer shall have passed."

4. The purpose of this rule is to require the ascending vessel, in the situation described, to give way to the descending vessel where the descending vessel believes that simultaneous navigation of the span would be hazardous. This rule is founded in good seamanship and common sense for the reason that a descending vessel may have no opportunity, because of the current afoot, safely to stop and reverse in time to avoid collision in the span or draw.

5. If, instead of proceeding diagonally across the bay from the bend in the river to the entrance of the east draw of the bridge, the Protector had rounded the bend properly so that it would be in a position to fair up its tow for the passage through the east draw, its presence and the presence of the Mack would have been known in plenty of time to execute the proper signals as required by Rule IV. It was this diagonal navigation of the bay which resulted in the

Protector's failure to initiate passing signals as required by the rule.

6. The failure of the ascending vessel to initiate passing signals does not relieve it of its responsibility as the burdened vessel, nor does it place an approaching a bridge span or draw situation under a different rule of navigation. Approaches to bridge spans or draws are to be navigated with Rule IV in mind and where one of the vessels fails to comply with its responsibility under the rule, then the other vessel is justified in sounding the danger signal and navigating for its own safety.

7. The master of the Mack was justified in proceeding on at slow speed after the first danger signal because there was no reason to assume that the Protector would not comply with her obligation to give way to the descending vessel. When it became apparent that the Protector was not going to give way and the Mack sounded her second danger signal, it was too late for the Mack to turn away to starboard. Such a maneuver would have tended to place the whole six hundred feet of her tow broadside to the current and the current would doubtless have set some part of the tow onto the stationary center of the span or the pilings adjacent thereto. Stopping and reversing engines would have brought about the result outlined in Paragraph 8 of these findings.

8. In spite of the fact that the Protector failed to lay to below the bridge as the rules and good seamanship dictate, the draw could still have been navigated safely· and simultaneously by both vessels if the Protector had had her tow properly faired up for the draw. ·

9. The collision was caused solely by the fault, negligence and want of care on the part of the Tug Protector and those in charge of her navigation. The Mack was free from fault.

10. In view of the delay in bringing this matter on for trial interest will be allowed only from date of this decree. The Salutation, 2 Cir., 37 F.2d 337; The Russell No. 3, 2 Cir., 82 F.2d 260; Coyle Lines, Inc. v. United States, 5 Cir., 198 F.2d 887.