In the Matter of the Complaint of BANKERS TRUST COMPANY, as Owner-Trustee and Monsanto Company, as Chartered Owner, and Keystone Shipping Co., as Chartered Owner and Operator of the SS EDGAR M. QUEENY, for Exoneration from and Limitation of Liability.

In the Matter of the Complaint of VILLANEUVA COMPANIA NAVIERA, S.A., Owner of the tank vessel CORINTHOS, for Exoneration from and Limitation of Liability.

Civ. A. Nos. 75–364, 75–2110.

United States District Court, E. D. Pennsylvania.

July 17, 1980.

As Amended July 21, 1980.

See also, 503 F.Supp. 337, 503 F.Supp. 361 and 503 F.Supp. 365.

James F. Young, Krusen, Evans & Byrne, Philadelphia, Pa., for the Queeny Interests.

Harry A. Short, Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for General Electric.

Richard W. Palmer, Palmer, Biezup & Henderson, Philadelphia, Pa., for Corinthos Interests.

C. Gary Wynkoop, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for Bethlehem Steel.

Benjamin F. Stahl, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for BP Oil, Inc., Sohio Petroleum Co.

Thomas A. Masterson, Morgan, Lewis & Bockius, Philadelphia, Pa., for William Powell Co.

## MEMORANDUM OPINION

WEINER, District Judge.

Before the Court for determination is the amount of damages to be awarded BP/Sohio and the Corinthos interests.* The trial of the damage issues was bifurcated from the trial of the liability issues. The Court issued its opinion determining the issues of liability on February 19, 1980, 503 F.Supp. 337, when it was concluded that the Queeny interests were not entitled to

---

* Sixty cases which included 112 personal injury, property damage and other sundry matters. This entire matter was transferred to this court in December, 1977. All the personal injury cases have been resolved, the majority of the property damage cases have been resolved and the balance are being processed.

352

limit their liability for the damages suffered by various parties as a result of the collision between the S.S. Edgar M. Queeny and the S.T. Corinthos on the Delaware River, at Marcus Hook, Pennsylvania during the early morning hours of January 31, 1975.

Trial of the damage issues took place on April 21, 1980. At that trial, BP/Sohio and the Queeny interests submitted to the Court a document entitled "Offer of Proof of Claim in Lieu of Trial". That document contained a stipulation authorizing the Court to enter judgment at the conclusion of the damages trial in BP/Sohio's favor against the Queeny interests.[1] Those parties concluded that the total of BP/Sohio's provable damages is $16,188,531.00. The stipulation and offer of proof did not address the issues of prejudgment interest, the interest rate as to either prejudgment or post–judgment interest, or the award of costs.

As between the Corinthos interests and the Queeny interests, no stipulation has been entered into regarding the amount of damages to be awarded. Thus, as to the damage claims of the Corinthos interests, the Queeny interests have identified four issues to be resolved. Briefly stated, these issues are: (1) What value is to be placed on the Corinthos; (2) Is Corinthos entitled to recover sums paid pursuant to Greek Law on various personal injury claims; (3) Is Corinthos entitled to prejudgment interest as to the damages awarded as compensation for the value of the Corinthos; and (4) Is Corinthos entitled to prejudgment interest as to the personal injury claims paid pursuant to Greek Law?

I

BP/SOHIO–PREJUDGMENT INTEREST

Turning first to the question of whether BP/Sohio is entitled to prejudgment interest, the Queeny interests contend that because BP/Sohio grossly overstated its original claim by demanding $25,986,936.00, the

parties could not bring a quick resolution to the case by entering into meaningful settlement negotiations. The Queeny interests argue that BP/Sohio's negotiation actions amounted to a bad faith representation of their damages, and therefore, prejudgment interest is not recoverable.

Neither the Queeny nor the BP/Sohio, nor the Corinthos interests acted with haste in this matter. There was a constant barrage of requests by both sides for continuances and delays.

In BP/Sohio's case, as in the Corinthos' case, it was uncertain who would bear legal responsibility for the damages suffered. In a situation where liability is contested, the give and take which normally occurs during settlement negotiations often produces demand and offer figures which are at opposite ends of the spectrum. Unless a settlement occurs, the Court cannot expect the damaged party to undervalue the extent of its damages nor the responsible party to overvalue its offer. Both parties are expected to negotiate in good faith.

■ Regarding the award of prejudgment interest in admiralty cases, no statutory provision exists. It is therefore left to the sound discretion of the Court to determine whether prejudgment interest should be awarded. *Dow Chemical Co. v. M/V Gulf Seas*, 593 F.2d 613 (5th Cir. 1979); *Mid–America Transportation Company, Inc. v. Rose Barge Line, Inc.*, 477 F.2d 914 (8th Cir. 1973); *Gardner v. The Calvert*, 253 F.2d 395, *cert. denied*, 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); *Maryland Shipbuilding & Drydock Co. v. Patapsco Scrap Corp.*, 169 F.Supp. 605 (D.Md.1959). Generally, in an admiralty case, prejudgment interest should be granted unless there are exceptional or peculiar circumstances. *Socony Mobil Oil Co. v. Texas Coastal and International*, 559 F.2d 1008 (5th Cir. 1977); *Mid–America Transportation Company, Inc. v. Rose Barge Line, Inc., supra; Sea–Land Service, Inc. v. Eagle Terminal Tankers*, 443 F.Supp. 532 (W.D.Wash.1977).

1. The stipulation is based upon the mutual recommendation of counsel. It reserved for the

principal parties the right to reject the stipulation within 90 days.

There are three basic factors which can result in the disallowance of prejudgment interest. The first factor is unreasonable or unexplained delay in the prosecution of the case which results in prejudice to the opposing side. *O'Donnel Trans. Co., Inc. v. City of New York*, 215 F.2d 92, 95 (2nd Cir. 1954); *The Russel No. 3*, 82 F.2d 260, 263 (2nd Cir. 1936). The second factor is a bad faith estimate of damages. *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F.Supp. 705, 711 (E.D.Pa.1962); *Maryland Shipbuilding & Drydock Company v. Patapsco Scrap Corporation, supra; Detroit & Cleveland Navigation Company v. The Steamer Elbert H. Gary*, 161 F.Supp. 570, 578 (E.D.Mich., S.D.1958). The third factor is where there are no actual damages incurred.

There is no question but that BP/Sohio suffered damage. In determining whether to award prejudgment interest we shall therefore examine and review the first two factors referred to above.

An examination of the records reveals that a finger cannot be pointed at any one party, accusing it alone of unreasonable delay. There have been many delays occasioned by the acts of all parties at one time or another. In any case, the initiative is always with the plaintiff. It should want to proceed to trial in haste to recover its damages. Any delays should work to its disadvantage. A plaintiff does not have the right to drag its cause because it expects to get prejudgment interest.

The factor concerning a bad faith estimate of damages is our next concern. The original claim of BP/Sohio was $25,986,-936.00. At the trial of the damage issues on April 21, 1980, BP/Sohio and Queeny filed a stipulation with the Court authorizing the entry of judgment in BP/Sohio's favor in the sum of $16,188,531.00, representing the provable damages.

■ Reviewing all of the circumstances of this case, with the wide variance between the estimate of damage and the provable damage, which provable damage was not resolved until more than five years after the accident, and the delays in bringing this case to trial, the Court is of the opinion that there should be no allowance of prejudgment interest.

## II

### VALUE OF THE CORINTHOS

[3] The measure of damages, when there is a total loss of a vessel, is its market value at the time of the loss. The Supreme Court discussed the measure of damages in the case of a total loss of a vessel in *Standard Oil Company of New Jersey v. Southern Pacific Company*, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1925). The Court stated:

"It is fundamental in the law of damages that the injured party is entitled to compensation for loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed. In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. *The Baltimore*, 8 Wall. 377, 385, 75 U.S. 377, 19 L.Ed. 463. Where there is no market value such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. *Brooks–Scanlon Corporation v. United States*, 265 U.S. 106, 123, 44 S.Ct. 471, 474, 68 L.Ed. 934. And by numerous decisions of this Court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value. *Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 287, 43 S.Ct. 544, 546, 67 L.Ed. 981, and cases

354

cited; *Bluefield Co. v. Public Service Commission*, 262 U.S. 679, 689, 43 S.Ct. 675, 677, 67 L.Ed. 1176; *Georgia Ry. & Power Co. v. Railroad Commission*, 262 U.S. 625, 629, 43 S.Ct. 680, 67 L.Ed. 1144; *Brooks–Scanlon Corporation v. United States, supra*, 265 U.S. at 125, 44 S.Ct. at 475; *Ohio Utilities Company v. Public Utilities Commission*, 267 U.S. 359, 45 S.Ct. 259, 69 L.Ed. 656. The same rule is applied in England. *In re Mersey Docks and Admiralty Commissioners* [1920], 3 K.B. 223; *Toronto City Corporation v. Toronto Railway Corporation*, [1925] A.C. 177, 191. It is to be borne in mind that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. *Minnesota Rate Cases*, 230 U.S. 352, 434, 33 S.Ct. 729, 754, 57 L.Ed. 1511.

■ The Corinthos was a steam turbine propelled tanker with a horsepower of 17,-000, built in 1963 at a cost of $5,194,000.00.[2] It had gross tons of 30,705, net tons of 20,935, and its deadweight tonnage was 56,-882. It was 723.7 feet in length, and 106 feet in breadth. Its depth was 52 feet, 35 inches. The Corinthos had a speed of 16¼ knots. It was a single deckhouse tanker. The deckhouse was located aft of all cargo tanks and contained all officer and crew accommodations. In addition, this enclosure also housed all propulsion machinery, and was topped by the wheelhouse and other navigating spaces. The cargo space on the Corinthos was separated into six tanks numbered fore to aft. The forwardmost tank was divided into port and starboard units, and the remaining five tanks were further divided into port, starboard and center spaces for a total of seventeen cargo tanks. The aft cargo pump room was located aft of the No. 6 center cargo tank, and just forward of the deckhouse.

Queeny called as its expert witness as to value a ship broker, Robert J. Pierot of Jacques Pierot, Jr. and Sons, Inc., ship brokers since 1894. He testified that he has been with the firm since 1952 as a broker and valuator of ships, and that the firm is involved in transactions for sale and purchase of over one hundred vessels per year. Mr. Pierot testified that the tanker market in late January, 1975, was "disastrous", that it had dropped tremendously. The Corinthos was a steam turbine ship. The witness pointed out that a steam turbine propelled ship consumes more fuel than a diesel propelled ship, and that with rapidly escalating fuel cost at the time of this collision, steam propelled vessels were less economic, and that fact was reflected in their market value.

Pierot defined market value as "what a willing buyer and a willing seller would sell it". He testified that the factors which determine market value include the sale of similar vessels, availability of similar vessels for sale on the market, and his estimation of what a willing buyer would pay for a similar vessel. He testified from a document marked Q–69 that a similar vessel named the Golar Martita was sold on January 31, 1975, for $1,200,000.00. The Golar Martita was a steam turbine tanker built in 1958, and was 42,270 tons deadweight. It had a horsepower of 16,500, gross tons of 25,337, and net tons of 16,928. It was 710 feet in length, 92 feet, 6½ inches in breadth, had a depth of 48 feet, 7 inches, and had speed of about 16 knots. The witness stated that although the Golar Martita was built five years before the Corinthos was built, the difference in age would not have been a substantial factor in the valuation of the vessels toward the end of January, 1975. The witness placed very little value on the charter under which the Corinthos was operating. He said that a charter may have an enhancing value of the price of a vessel and it might have a depressing value, depending on the particular form of the charter.

2. The parties stipulated that the cost of con-   struction was $5,194,000.00.

Pierot placed a market value on the Corinthos at the time of collision on January 31, 1975, at $2,500,000.00.

Corinthos relied on the testimony of Eric Bates and Edward F. Ganly, vessel appraisers. Mr. Ganly testified that he was a 1936 graduate of Webb Institute of Naval Architecture with a bachelor's degree in Naval Architecture and Marine Engineering. He was employed as a marine surveyor from 1937 to 1961, at which time he began his own business. He was active in the business until he sold it in 1978. He testified that beginning in 1940 he calculated values of many different types of floating equipment, and that through the years he has appraised over a thousand vessels. His testimony at the trial was an affirmance of the valuation placed upon the Corinthos by Eric Bates.

Mr. Bates is a chartered engineer. He was employed in the technical design department of a shipbuilder from 1935 to 1939. From 1940 to 1946 he was an engineer in the Royal Navy. He was employed by British Petroleum from 1946 to 1971. From 1971 to 1978 he was a marine surveyor with Ganly Briggs, Inc.

Mr. Bates' testimony was introduced at the trial by way of depositions taken on November 24, 1978 (Exhibit C 335A) and on January 13, 1978 (Exhibit C 335B). Mr. Bates testified that Ganly Briggs, Inc. were marine surveyors. While employed by them he conducted valuations of vessels as well as surveying.

Mr. Bates testified that in making a valuation of a vessel the important information to be obtained are the carrying capacity which is deadweight tonnage, the speed in knots, and the age of the vessel (Bates Deposition, p. 20, Exhibit 335A). He stated that he looked at sales of comparable vessels in making a valuation. Bates testified that after searching the records, he had found no comparable vessels of similar size, age and capacity to the Corinthos which had been sold at about the time of the Corinthos loss. The Corinthos interests argue that in the absence of comparable sales, there can be no market value of a vessel.

They claim that under these circumstances we must refer to the other factors regarding the Corinthos, such as her age, capacity, speed, marine hull insurance, marine risk insurance, profitable charter operation, and reputation among major tank operators. Bates valued the Corinthos as of the date of loss at $7,981,400.00. In his valuation of the Corinthos Bates relied upon the sale of a vessel by the name of Thorhild which was sold in November, 1974. The witness testified that the Thorhild had a deadweight of 52,500 tons and was sold for $7,600,000.00. By dividing the tonnage into the sales price, Mr. Bates arrived at a figure of $144.76 per deadweight ton. He stated that the Thorhild was 15¾ knots whereas the Corinthos was 16¼ knots. He placed a factor for the ½ knot difference at 1.025. Thus, he multiplied $144.76 by 1.025 and obtained a figure of $148.38 per deadweight ton in making his valuation of the Corinthos.

Mr. Bates testified that he used discounted cash flow for depreciation purposes, and in this valuation, he used 5%. He therefore took 5% of the Corinthos deadweight tonnage of 56,882 and came up with 54,120. He multiplied 54,120 by $148.40 (dollars per deadweight ton), giving him a gross valuation of $8,031,400. Still using the sale of the Thorhild as his basis for valuation of the Corinthos, Mr. Bates testified that the Thorhild had just come out of a four year survey and had in it $200,000.00 worth of work which the new owner would not have to spend himself. He went on to say that at the time he valued the Corinthos it was approximately one year after it had a major survey. He testified "One year in four is one quarter. One quarter of $200,000.00 is $50,000.00; and, therefore, I deducted $50,000.00 from the computation of dollars per deadweight times the deadweight of the Corinthos ...". Thus, by deducting $50,000.00 from $8,031,400.00 Mr. Bates arrived at his valuation of the Corinthos of $7,981,400.00. We find that that market value is grossly overstated.

Mr. Bates failed to take into consideration that the Thorhild was a motor vessel, and there was testimony that there were

very extensive favorable credit terms which was a factor in increasing the sales price of the vessel. Another Corinthos witness was George Bisbas, director of N.J. Goulandris (Agencies), Ltd., which was the agent for Villaneuva Compania Naviera, S.A., owner of the Corinthos. His testimony was that the Corinthos had a charter to a first rate oil company, Amoco, which charter had twenty–eight months to run from the date of the loss of the Corinthos. He computed the net profit under the charter as $204,975.00 per month which when multiplied by the twenty–eight months remaining under the charter, totals $5,740,000.00 as the net profit expected in the operation of the Corinthos under the Amoco charter. The Corinthos interests, however, agree that they are not claiming loss of future earnings under the charter. They claim that the vessel's value was substantially enhanced by the charter earnings.

The only charter introduced into evidence is a charter between Marceloso Compania Naviera and Amoco Trading International, Ltd. The charter is for a vessel named the Antipolis. The charter provided that other vessels named in the charter may be substituted for the Antipolis. At the time of the collision, the Corinthos was a substituted vessel under this charter.

We do not give much weight to the value of this charter in determining the value of the Corinthos. There has been no evidence as to the length of time the Corinthos operated under the charter. The Corinthos owner was not a party to the charter. The Corinthos could have been substituted for by another vessel. We find that, under those circumstances, this charter could not enhance the value of the Corinthos. If the Corinthos had been for sale, a prospective purchaser would certainly want to know how he could be assured of the anticipated profits to be gained under this charter if he were to place any value upon it in determining the market value of the vessel. This court in having to determine the market value of the Corinthos stands in the shoes of a prospective purchaser of the vessel.

What we must do is arrive at a sum which could have probably been obtained for the Corinthos had she been sold just prior to the collision on January 31, 1975. It is the sum a willing purchaser would have paid for the vessel in sound condition on that date. Such a sales price can never be exact since such a sale never took place. We must approximate the market value of the vessel taking all other factors into consideration.

We shall examine the sales of the vessels, Golar Martita and Thorhild, and their comparison with the Corinthos.

We reject the comparison by which Mr. Bates determined the market value of the Corinthos. His use of the sale of the Thorhild for obtaining his calculations for valuation of the Corinthos was not proper. The Corinthos was "a steam turbine propelled tanker whereas the Thorhild was a motor vessel. With the rapidly declining tanker market in late January 1975, and the rapidly escalating fuel cost at that time, the market value of steam turbine vessels was much lower than motor vessels since steam propelled vessels were less economic because they consumed more fuel than diesel propelled vessels. Another reason the sales price of the Thorhild is not controlling in valuing the Corinthos is that the Thorhild was sold in November 1974, whereas the market value of the Corinthos must be determined as of January 31, 1975. Both Mr. Pierot and Mr. Bates agreed that the market for ships in the January 1975 was a very poor market. (Bates Deposition, p. 63, Exhibit C 335A) (Pierot Testimony, N.T. 1619).

In contrast, the comparison used by Mr. Pierot appears more sound. The Golar Martita was sold on January 31, 1975, the exact date of the Corinthos loss. They were both steam turbine propelled vessels. The Corinthos had a speed of 16¼ knots, and the Golar Martita had a speed of 16 knots. The vessels had similar horsepower, the Corinthos 17,000, the Golar Martita 16,500. The deadweight tonnage of the Corinthos was 56,882, the Golar Martita 42,270. The Corinthos length was 723.7 feet, the Golar Martita 710 feet. Their breadth and

depth were also similar, the Corinthos breadth being 106 feet, the Golar Martita 92 feet, 6½ inches; Corinthos depth 52 feet, 35 inches, the Golar Martita 48 feet, 7 inches. The one very distinguishing feature between the two vessels was age. The Corinthos was built in 1963, the Golar Martita in 1958.

If we were to use the same method for calculations which Mr. Bates used, but substituted the Golar Martita for the Thorhild, we would divide the deadweight tonnage of 42,270 of the Golar Martita into its sales price of $1,200,000.00 and obtain $28.39 for the per deadweight ton. Multiplying the per deadweight ton figure of $28.39 by the deadweight tonnage (after deducting the 5% depreciation) of 54,120 we get the result of $1,614,879.98 as the market value of the Corinthos. We have not deducted any variable for the yearly survey, since no information of any survey expenses were given concerning the Golar Martita. Obviously the market value for the Corinthos was greater than $1,614,879.98. Even Mr. Pierot, called by the Queeny interests as their expert witness, valued the Corinthos at $2,500,000.00. We shall therefore examine other factors which might increase the value of the Corinthos.

In arriving at the market value of the Corinthos we have examined its deadweight tonnage as compared to the other vessels which were used for comparison by the experts who testified in this case. It is important to consider the deadweight tonnage because as Mr. Bates testified, "Combined with the speed, it is the earning power of the vessel." (Bates Deposition, p. 31, Exhibit C 335A). The Golar Martita had deadweight tonnage of 42,270, the Thorhild 52,500, the Corinthos 56,882. The Golar Martita had speed of 16 knots, the Thorhild 15¾ knots, and the Corinthos 16¼ knots. Thus the Corinthos was the fastest and had the largest carrying capacity or deadweight tonnage of the three vessels. These factors raise the value of the Corinthos. Also, the Golar Martita was five years older than the

Corinthos. That also enhances the value of the Corinthos over that of the Golar Martita.

If we were to use the previously discussed value of $1,614,879.98 for the Corinthos as our base figure, we will add the factors which we feel have enhances that value. The speed of the Corinthos was 16¼ knots compared to 16 knots for the Golar Martita. That quarter knot has a factor of 1.0125. Multiplying 1.0125 by the value of $1,614,879.98 gives us a resulting value of $1,635,065.98. We have determined that the deadweight tonnage or carrying capacity of the Corinthos was 56,882 compared to 42,270 for the Golar Martita. The Corinthos has therefore 33⅓% more carrying capacity. Thus by dividing $1,635,065.98 by three we have a resulting figure of $545,021.99, which when added to $1,635,065.98 gives us a Corinthos value of $2,180,087.97. We now consider the age of the vessel. The Golar Martita was five years older than the Corinthos. A vessel is usually thought to have a life span of twenty years. If we therefore take 25% (5 years at 5% per year) of $2,180,087.97 we have a result of $545,021.99, which when added to $2,180,087.97 gives us a market value of the Corinthos of $2,725,109.96.

## III

## CORINTHOS CLAIMS FOR REIMBURSEMENT OF PAYMENTS MADE BY IT

██ Queeny claims that at the trial, Corinthos failed to prove Greek law. The brief of counsel for the owner of the Corinthos has attached as Exhibit "E" a letter addressed to Queeny's counsel dated April 29, 1980, which letter purports to be an agreement between the parties that live testimony of a Greek lawyer would not be necessary if a satisfactory text of the Greek law was produced.[3] Also attached to the brief is a certification by Constantine A. T. Lascaratos of G and N L Daniolos with an explanation of the applicable Greek law.[4]

---

**3.** A copy of the letter of April 29, 1980, is attached hereto as Appendix A.

**4.** See Appendix B attached hereto.

The Court has examined the applicable sections of the Greek law and compared them to the payments made by Corinthos. For the death claims, the law provides for compensation of five years wages. Although the Court has not been provided with the salary of each decedent, the payments range from $6,146.11 to $22,518.87. The Court can take judicial notice that a seaman in 1975 earned in excess of $4,500.00 per year, so the payments did not exceed the Greek law provision of five years wages for compensation of a death claim. The settlements and payments by Corinthos appear proper on their face and shall be allowed in the amount of $240,904.76.

The same reasoning holds forth for the survivor claims. The Greek law provides in the case of total permanent disability for compensation containing six years wages. The settlement payments for survivors ranged from $1,002.03 to $5,891.09. Those payments did not exceed the provisions contained in the Greek law, and appear proper on their face and shall be allowed in the amount of $40,119.16.

The payments by Corinthos for undertakers in the sum of $7,032.68, for transportation of remains, in the sum of $4,008.24, for repatriation, food, lodging, etc. in the sum of $27,858.40, and for telephone charges in the sum of $27.35 all appear proper and shall be allowed.

The Corinthos asks for reimbursement for a pollution fine paid to the U. S. Coast Guard in the sum of $2,500.00. Since Queeny admits that this claim has been proven, we shall allow it.

Queeny also admits that the Corinthos claim for extraordinary agency fees and expenses paid to B. H. Sobelman, in the amount of $12,000.00 is correct, and we shall allow that claim.

Corinthos asks also for reimbursement of extraordinary agency fees and expenses paid to Lamorte, Burns & Co., Inc. in the total amount of $25,401.60. An examination of the record fails to disclose the proof by Corinthos of payment to Lamorte, Burns & Co., Inc. and we shall therefore disallow that claim.

IV

## CORINTHOS CLAIMS–PREJUDGMENT INTEREST

■ We now turn our attention to the question of whether Corinthos is entitled to prejudgment interest.

We have already discussed the law as to prejudgment interest in part I of this Opinion in regard to BP/Sohio.

Queeny contends Corinthos is not entitled to prejudgment interest because it (Corinthos) caused unreasonable delay in the prosecution of the case, which caused prejudice to the Queeny interests, and further that Corinthos made a bad faith estimate of its damages.

We shall first examine the claim by Queeny that Corinthos made a bad faith estimate of damages. Queeny claims that Corinthos at various times during the litigation maintained that their damages ran from $12,000,000.00 to $35,000,000.00; whereas, they now value the vessel at $7,981,400.00. Queeny contends that the exaggerated claim made meaningful resolution of the litigation impossible. Corinthos on the other hand claims that Queeny never made any realistic offers above $3,000,000.00.

In connection with their other contention that Corinthos caused unreasonable delay in the prosecution of the case, Queeny states that it took Corinthos five years after the commencement of this action to furnish it with their claim for the death, personal injury and related items of expense.

The Court recognizes the immense scope and complexity of this litigation. The parties had to conduct intensive discovery before settlement negotiations could be conducted. There were voluminous documents which had to be reviewed.

The Court cannot place responsibility upon the Queeny interest for delaying any settlement in this case. We do not feel that prejudgment interest should be awarded to Corinthos because there were exceptional circumstances in this case which prevented a prompt resolution of the claims.

POST JUDGMENT INTEREST

Post judgment interest shall follow the judgment at the legal rate of interest allowable in the Commonwealth of Pennsylvania.

APPENDIX A

EXHIBIT E

April 29, 1980

James F. Young, Esq.

Krusen, Evans & Byrne

Public Ledger Building

Philadelphia, PA 19106

CORINTHOS/QUEENY

*Our File: 8411–001*

Dear Jim:

We confirm your agreement at the Bisbas deposition on Friday afternoon, April 18, that you would not insist that we prove Greek law at the trial by offering the live testimony of a Greek lawyer if we could produce a satisfactory text of the Greek law which would save court time and expense. On that date we offered to commit a Greek lawyer to appear, if necessary.

It was also agreed that you would not take the position at the trial that we had failed to prove Greek law if we did not offer at the hearing proof of Greek law.

At the trial on Monday, April 21, the Court specifically allowed us to produce a certification of Greek law in order to avoid the necessity of bringing in a Greek lawyer to prove the text as to the rights of injured and deceased seamen.

We have now received the text of the relevant sections of Greek law together with the lawyer's certification thereof, copy of which is enclosed in accordance with the Court's instructions.

> Very truly yours,
>
> Richard W. Palmer

RWP/ns

cc: Hon. Charles R. Weiner

Benjamin F. Stahl, Jr., Esq.

P.S. We confirm that your motion to strike certain parts of the video deposition testimony of Mr. George P. Bisbas was received at our office Saturday morning, April 26, 1980 and was not hand delivered as it could have been since you were dispensing with the five day notice prescribed to permit us to file a response. Monday morning, April 28, 1980, Judge Weiner declined to allow us the usual five days to file a response but gave us permission to answer your motion in our Main Brief which at the same time he ordered filed by 0930 on Wednesday, April 30, 1980. We had been proceeding on the understanding reached with all counsel at the hearing on April 21 that Main Briefs were to be filed within one week after receipt of the transcript of the hearing on April 21, 1980. We are complying with the Judge's instructions given yesterday.

> R.W.P.

APPENDIX B

1253 EDT+

PALMBEE PHA

216021 DAND GR

216021 DAND GR

28.4.80

MSSG 4/116

ATTN.: VERNON C. MILLER, ESQ.,

RE: "CORINTHOS"–"QUEENY"

PLS NOTE FOLLOWING SECTIONS (TRANSLATION INTO ENGLISH OURS) OF GREEK LAW GOVERN FOLLOWING ITEMS:

1. LOSS OF PERSONAL EFFECTS
   LAW NUMBER 3316 OF 1953 RE: RATIFICATION OF THE CODE OF PRIVATE MARITIME LAW ARTICLE 63 THEREOF PROVIDES:
   "THE SEAMAN IS ENTITLED TO FAIR COMPENSATION FOR THE LOSS DUE TO SHIPWRECK, FIRE OR SIMILAR EVENT, OF HIS EFFECTS OF PERSONAL OR PROFESSIONAL USE".

IN PRACTICE SHIPOWNER PAYS A LUMPSUM TO OFFICERS AND ANOTHER TO CREW. IN OUR OPINION THE AMOUNTS PAID IN THIS CASE WERE CONSTITUTING A "FAIR" COMPENSATION.

2. COMPENSATION FOR INJURIES TO INJURED SEAMEN AND TO NEXT OF KIN IN CASE OF FATAL INJURIES.

ARTICLE 66 SECTION B OF THE CODE OF PRIVATE MARITIME LAW PROVIDES:

"THE ABOVE PROVISIONS APPLY ALSO ON ACCIDENTS DUE TO A VIOLENT EVENT AND IF THE SEAMAN SUSTAINED BECAUSE OF THEM (ACCIDENTS PARENTHESIS OUR) DISABILITY TO WORK, AS WELL AS IN CASE OF DEATH, THERE ALSO APPLY THE SPECIAL PROVISIONS RE COMPENSATION OF WORKMEN WHO SUFFERED ACCIDENTS IN WORK". WITH THE ABOVE SECTION, LAW NUMBER 551 OF 1915 AS AMENDED IS INCORPORATED BY REFERENCE.

ARTICLE 3 OF LAW 551/1915 PROVIDES ITSELF THE FORMULA FOR THE CALCULATION OF COMPENSATION AS FOLLOWS:

A. PERSONAL INJURIES

I. TOTAL PERMANENT DISABILITY IN CASE OF TOTAL PERMANENT DISABILITY THE COMPENSATION CONTAINS SIX YEARS WAGES (...) AND IF THE TOTAL OF THE SIX YEARS WAGES EXCEEDS ONE HUNDRED THOUSAND DRACHMAE, THE SUM OF ONE HUNDRED THOUSAND DRACHMAE IS ADDED TO THE ONE FOURTH OF SUCH EXCESS.

II. PARTIAL PERMANENT DISABILITY IN CASE OF PARTIAL PERMANENT DISABILITY IT CONTAINS SIXFOLD THE AMOUNT BY WHICH IT WAS REDUCED OR MAY BE REDUCED THE ANNUAL WAGES OF THE INJURED (...) ON REDUCTION EXCEEDING ONE HUNDRED THOUSAND DRACHMAE THE SUM OF ONE HUNDRED THOUSAND DRACHMAE IS ADDED TO THE ONE FOURTH OF SUCH EXCESS.

III. FATAL ACCIDENTS

IN CASE OF DEATH THE COMPENSATION CONTAINS FIVE YEARS WAGES (...) IF THE FIVE YEARS WAGES EXCEED ONE HUNDRED THOUSAND DRACHMAE, THE SUM OF ONE HUNDRED THOUSAND DRACHMAE IS ADDED TO THE ONE FOURTH OF SUCH EXCESS.

3. REPATRIATION AND RELATED EXPENSES

ARTICLE 73 OF THE CODE OF PRIVATE MARITIME LAW PROVIDES: "THE SEAMAN ON TERMINATION OF HIS CONTRACT OF EMPLOYMENT IS ENTITLED TO REPATRIATION"

4. FUNERAL EXPENSES

LAW NUMBER 366 OF 1968 RATIFIED INTERNATIONAL TREATY NUMBER 55 OF GENEVA EXECUTED ON 6TH OCTOBER 1936. ARTICLE 7 OF SAID TREATY PROVIDES:

"THE SHIPOWNER MUST BEAR THE FUNERAL EXPENSES IN CASE OF DEATH ON BOARD, OR IN CASE OF DEATH ASHORE, WHEN THE DECEASED IS AT THE TIME OF DEATH ENTITLED TO CARE BY SHIPOWNER".

WE INTEND TO INCLUDE THESE PERTINENT PROVISIONS IN A LETTER WITH OUR CERTIFICATION AND MAIL IT TO YOU TOMORROW UNLESS YOU WOULD LIKE A CLARIFICATION IN WHICH CASE PLS TELEX BY RETURN. CONFIRM OUR CONSTANTINE LASCARATOS OR OUR DIMITRI ASTRAS COULD COME TO PHILADELPHIA BUT WOULD APPRECIATE TO GIVE US ESTIMATE OF POSSIBLE DATES.

BEST REGARDS

C.A.T. LASCARATOS

G AND N. L. DANIOLOS +

PALMBEE PHA

216021 DAND GR

VIA ITT

PCA APR 29 0431 +

PALMBEE PHA

216021 DAND GR

MSGE 4/121

APRIL 19, 1980

ATTN: VERNON C. MILLER, ESQ.

"CORINTHOS"

PLS REFER TO MY TLX OF YESTERDAY, QUOTING PERTINENT PARTS OF APPLICABLE GREEK LAWS ON SUCH CREW MATTERS AS LOSS OF PERSONAL EFFECTS, REPATRIATION AND RELATED EXPENSES, COMPENSATION FOR PERSONAL INJURIES AND DEATH, AND FUNERAL EXPENSES.

I HEREBY CERTIFY THAT THE ABOVE QUOTED PROVISIONS OF THE GREEK LAW ARE TRUE AND CORRECT TO THE BEST OF MY PROFESSIONAL KNOWLEDGE AND BELIEF AS A MEMBER OF THE BAR OF ATHENS OF THE REPUBLIC OF GREECE. THAT IS:

LOSS OF PERSONAL EFFECTS UNDER ARTICLE 63 OF LAW NS 3816 OF 1953 RATIFYING THE CODE OF PRIVATE MARITIME LAW, OF COMPENSATION FOR INJURIES TO INJURED SEAMEN AND NEXT OF KIN IN CASE OF FATAL INJURIES UNDER ARTICLE 66 SECTION 5 OF THE ABOVE CODE OF PRIVATE MARITIME LAW WHICH INCORPORATES LAW NS 551 OF 1915 AS AMENDED, REPATRIATION AND RELATED EXPENSES UNDER ARTICLE 73 OF THE ABOVE CODE OF PRIVATE MARITIME LAW AND FUNERAL EXPENSES UNDER ARTICLE 7 OF THE INTERNATIONAL TREATY NS 55 OF GENEVA EXECUTED 6 OCTOBER 1936. RATIFIED BY LAW NS 366 OF 1968.

SIGNED

CONSTANINE A T LASCARATOS

C AND N L DANIOLOS

+

PALMBEE PHA

216021 DAND GRM

RCA APR 29 0441 +

PALMBEE PHA

216021 DAND GRM

See also, 503 F.Supp. 337, 503 F.Supp. 350 and 503 F.Supp. 365.