CRAIN BROTHERS, INC., a Corporation,

v.

DUQUESNE SLAG PRODUCTS COMPANY, a Corporation, Appellant.

DUQUESNE SAND COMPANY, a Corporation,

v.

DUQUESNE SLAG PRODUCTS COMPANY, a Corporation, Appellant.

Nos. 12856, 12857.

United States Court of Appeals Third Circuit.

Argued Sept. 22, 1959.

Decided Dec. 30, 1959.

James B. Doak, Philadelphia, Pa., Hamilton A. Robinson, Pittsburgh, Pa., J. Harry LaBrum, Philadelphia, Pa., advocates (Dickie, McCamey, Chilcote & Robinson, Pittsburgh, Pa., LaBrum & Doak, Philadelphia, Pa., on the brief), proctors for appellant.

C. Brewster Rhoads, Philadelphia, Pa. (Harland I. Casteel, Campbell, Casteel & Thomas, Pittsburgh, Pa., on the brief), proctors for appellees.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

Plaintiffs have sued for and have recovered judgments against the defendant for the total loss or the damaging of some eighteen barges, severally owned by them, said to have been caused by the negligence of the defendant. Plaintiff Crain Brothers, Inc. owns a controlling interest in plaintiff Duquesne Sand Co., although they are separate corporations. The barges in suit were used by the plaintiffs for hauling sand and other materials on the navigable rivers in the Pittsburgh area.

It is the theory of the libel that defendant, having possession and control of two barges, negligently failed to secure them properly during a storm, with the result that they broke from their moorings, proceeded down stream and struck and damaged various other craft, including an entire moored fleet of barges which was caused to break loose. Some of the damaged barges were recovered afloat; others sank and were raised. Some were a total loss; others were repaired and returned to service.

The court found for the plaintiffs on the contested issues of negligence and causation. On this appeal we find adequate basis in the record for the trial court's conclusion that, all circumstances considered, the defendant failed to use due care in securing the barges which first broke away. We also find sufficient evidence that it was these barges which struck and caused damage to the various other barges involved in this suit. Thus, the finding of liability is well founded and must stand.

However, various substantial questions have been raised concerning the determination and award of damages. Crain recovered the principal sum of $128,992.-82. Duquesne recovered $100,504.10. Each lump sum award was determined by aggregating numerous items such as market value, repair cost, salvage cost and detention damages as determined for each barge separately. On this appeal these computations and allowances are challenged in detail.

■ Included in the damages awarded for Crain barges 105, 309, 104, 337, 332 and 433, and Duquesne barges 21, 201 and 215, were allowances for "loss of use". Although the amounts awarded for loss of use were not segregated in the court's findings, it is asserted without contradiction on this appeal that these detention damages as allowed aggregated $3,180 for Crain barges and $1,660 for Duquesne barges. The proof on this matter consisted of evidence of the number of days each barge was out of service and testimony that the charter rate for open steel barges of this type in the Pittsburgh area at the time in question was twenty dollars a day. Also said to be relevant is testimony that the barges were damaged during a busy season and at a time when there was a general shortage of such vessels in the area.

On the other hand it is correctly pointed out that at the time the barges in suit were damaged there were some fifty-five barges in the Crain fleet and all were not constantly in use. Moreover, for more than six years Crain had not released any of its idle barges to others on charter. The evidence also established that during the period that the damaged barges were out of service the appellees did not obtain or attempt to obtain by charter any additional equipment to supplement the available units of their own fleet. They conducted the transportation required in their business with their own undamaged barges until the others were returned to service. It does not appear whether during this period it was necessary that the appellees curtail their normal business activity in any way, or whether the undamaged barges were sufficient for all of the hauling their business required. There is no showing of diminished profits while barges were out of service. True, it seems likely that, with so much equipment out of service at a busy time, diminished ability to transport sand and other commodities would result in some economic loss. But there is simply no proof on this issue. We have only a showing as to the general value of the use of barges in terms of customary charter rates in the community.

■ The above outlined proof is insufficient to support an award of detention damages. The unquestioned general rule governing the award of detention damages is that "demurrage will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty". See The Conqueror, 1897, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937. In applying this rule in Brooklyn Eastern District Terminal v. United States, 1932, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240, the Supreme Court set aside an award measured by the cost of chartering a substitute tug where it appeared that claimant had not in fact chartered a substitute for its own damaged tug, but had used its other two tugs overtime to handle the additional work normally assigned to its temporarily disabled vessel. It was not shown that this had increased transportation costs or increased depreciation on the undamaged vessels. More recently the Court of Appeals for the Second Circuit has clearly stated and applied the applicable doctrine, saying:

"Where, as here, demurrage is claimed for a ship used exclusively to transport cargo used in the business of the shipowner, the damage may be shown by the cost of a substitute or by proving the loss to the business of the shipowner by being deprived of the use of the ship in that business. * * * As no substitute vessel was procurable or procured, the loss is to be measured by the extra cost, if any, of transporting, processing, and selling the petroleum which the 'Hurley,' but for the detention, would have transported * * *." Sinclair Refining Co. v. The American Sun, 2 Cir., 1951, 188 F.2d 64, 66.

Perhaps closest on its facts to the present case is The Glendola, 2 Cir., 1931, 47 F.2d 206, 208, where the cost of a substitute vessel was proved but the evidence showed that the remainder of the claimant's fleet had absorbed the work of the damaged vessel. The court summed the matter up as follows:

"* * * damage lay either in the embarrassment to its business in general, or in the cost of a substitute, chartered to take the Tilford's place. * * * [T]he first is not provable when, as here, no definite sum can be attributed to the detention. It was certainly not enough to show the reasonable hire of such a ship as the Tilford, measured in terms of current fixtures."

■ Thus, on the present record an award of detention damages is not justified. But even so, appellees point to the normal expectation of substantial injury as the result of the disabling of so many vessels as were damaged in this case and urge that it would be fair to give them an opportunity even now to supply the district court with evidence of the fact and the amount of detention damages, although such evidence was not included in the original presentation. We are disposed to grant this request, particularly since appellant too has asked to be permitted to submit additional proof, albeit on another point to be discussed.

■ Guided by estimates of expert witnesses for plaintiffs, the court awarded $17,500 and $15,000 as the fair market value of Crain barges 333 and 334, although defense experts estimated the value as much less. Crain had purchased these vessels as old barges in 1949 for about $4,800 each. Thereafter, it had made very substantial repairs and renewals, putting the barges in first class condition. In addition, there was testimony that these barges were lost at a time when the scarcity of such vessels and the great demand for them had substantially increased the market price.

Crain's expert witnesses who testified to the value of the barges emphasized the fact that the age of a barge and the time of re-siding and major renewal were both essential considerations in estimating present value. Accordingly, both of these factors were very important in the basic data upon which the Crain estimates were predicated. The record shows that the expert witnesses proceeded on the assumption that the barges were from eighteen to twenty-one years old in 1956 when they were damaged. While this was not controverted at the trial a motion to reopen to take further proof on this issue was made and denied after the trial. It now appears that in 1954 in another suit to which the present defendant was not party, the president of Crain Brothers, Inc. testified that these barges were built in 1929 and the court there found this to be a fact. Crain Brothers, Inc. v. Wieman and Ward Co., D.C.W.D.Pa., 1954, 126 F.Supp. 675, 678. We think this indication of serious error in the essential data Crain had given its witnesses for estimating the value of the barges calls for a reopening and redetermination of this question.

The basic assumptions of Crain's experts appear to have been incorrect in another particular. One expert assumed that the barges had been re-sided with steel within the preceding five or six years. A second witness assumed re-siding between the end of the Second World War and 1949. Yet the undisputed testimony of Clifford Crain, president of Crain Brothers, Inc. and general man-

ager of Duquesne Sand Co., was that residing had been done by Crain's predecessor in title "during the war". This discrepancy between the assumption of the experts and the only evidence on the question was substantial. In these circumstances we think that justice requires the retrial of the entire question of the market value of barges 333 and 334.

Duquesne barges 204, 205, 206 and 214 were lost. The court, again guided by estimates of plaintiff's witnesses, valued each barge at $20,000 and awarded that full sum. Plaintiff's experts determined value on the assumption that the barges had been rebuilt within the two years immediately preceding the accident. But the evidence does not justify this assumption.

Admittedly, these barges were twenty-five years old when lost. Admittedly, plaintiff bought them as old barges in 1948 for an average price of $5000 each. On the other hand it is equally clear that at some time plaintiff practically rebuilt the barges around the framing. The extent of this work is indicated by testimony that "we spent fifteen to eighteen thousand dollars on each one of these barges". There was also a statement in the testimony of President Crain that "in some cases" there had been "repairs" just before the barges were lost. However, Mr. Crain's testimony, considered in its entirety, seems to mean that the major rebuilding had occurred soon after the purchase of the old barges in 1948, rather than very recently. In relevant part Crain's testimony was as follows:

"Q. When did you buy those barges?

"A. About 1948.

"Q. Mr. Crain, after you obtained these barges, after you obtained Barge DSC 204 did you make any repairs?

"A. We bought the barges because the framing was good and we practically built a barge around this framing.

"Q. Describe to the Court the type of repairs and renovations that you made to this barge.

"A. These barges due to the type of unloading facilities that the Wheeling Steel [the seller] has, they do not have to have hopper bottoms in their barge, so the coal lays in between the members in the bottom of the barge. First of all, we cleaned all that coal out, put a steel hopper bottom in all these barges, repaired the miscellaneous repairs on the hopper sides, repaired the head logs and corner bands and then we put them on the docks and resided them and reracked them and put new knuckles to link the barges."

We think this testimony can reasonably be understood only as a description of what happened shortly after the plaintiffs bought the barges in 1948. No doubt the barges were kept in repair thereafter and additional work was necessary on them from time to time, some of it shortly before the accident in suit. But we do not think that the testimony can fairly be read as indicating that the major rebuilding of the barges had occurred just before the accident rather than soon after their acquisition. Here again plaintiff's experts determined value on premises not supported by the record. There should be a reconsideration of this matter.

■ The work of salvaging both Crain's barges and Duquesne's barges was done by Crain, which performs a large part of the salvage work in the Pittsburgh area as part of its regular business. With respect to five of its own barges, Crain claimed as damages for these repairs not only the itemized cost of the operation but an additional percentage for "profit".

In support of the claim for the allowance of a profit on this operation it is argued that if an independent contractor had performed this work for Crain, an item of profit would properly have been included in the charge and would have constituted an element of damages recoverable by Crain from defendant. But the reason that Crain could have recovered this item is that its actual loss would have been the full amount charged by

the independent contractor, including the contractor's profit. On the other hand, performing the work itself, Crain was out-of-pocket only the cost of the operation. Crain is entitled to be compensated fully for its losses and expenses as a result of the accident in suit, not to make a profit on the mishap. Crain's recovery for its own salvage work must be reduced accordingly.

While Crain is the principal owner of Duquesne, it is argued that Crain acted as an independent contractor in salvaging the Duquesne barges. If it is shown that Duquesne actually became obligated to Crain for an amount which included a profit item for the salvage work, we think this argument is sound. Duquesne is entitled to the amount it must pay, whether to Crain or to anyone else, for any proper salvaging of its barges.

An award of some $2000 was made to reimburse Crain for the cost of repairing two barges of the Ohio River Barge Line which were struck by a runaway Crain barge. The Ohio Line had billed Crain for this expense and Crain paid the bill. However, the breakaway of the Crain barge is found in this case to have been caused by the negligence of the appellant without fault of Crain. Accordingly, Crain demands reimbursement from appellant. However, if Crain acted officiously or as a volunteer in paying money to satisfy appellant's tort obligation to the Ohio Line, it may not recover over from appellant. See Restatement, Restitution, § 112. In the present case a recovery over would deprive appellant of normal opportunity to raise as against Ohio any question as to the extent of Ohio's damage, the reasonableness of its charges or any other matter of defense as between defendant and Ohio. On the other hand, a witness for Crain testified that its payment to the Ohio Line was necessitated by the likelihood that Ohio would have sued it. During the course of this testimony the trial judge suggested and the witness agreed that the likelihood of attachment of Crain's equipment by Ohio was also a factor. But on the present record an action by Ohio against Crain would have been groundless and could not have succeeded. Certainly the release of any attached vessel or other property on bond pending adjudication would not have been a difficult or very costly procedure. We find no compelling circumstances to make Crain other than a volunteer in paying Ohio as it did. See discussion of this type of payment in Hope, *Officiousness*, 1929, 15 Cornell L.Q. 205, 239, 242. This item of the Crain claim should have been disallowed.

Other small items have properly been questioned. In the claim for the repair of the Crain barge No. 337 there are discrepancies between the Crain invoice on which the award was based and the work sheet from which the invoice was derived. Again, both parties recognize a small duplication of towing charges for Crain barge 332. Finally, the parties also agree that interest on various expenses of repair and salvage has been allowed from incorrect dates. On several repair items interest has been allowed from the date upon which the repaired barges were ready again for service, and on salvage costs, from the date of the accident. But it is clear that no interest was legally allowable until appellees had actually paid the charges in question. Utility Service Corp. v. Hillman Transportation Co., 3 Cir., 1958, 244 F.2d 121. Yet, the record does not even show when the several bills were paid. Of course, Crain's salvaging of its own barges stands on different footing since its expense was incurred when the work was done.

One other point deserves mention. It concerns the sunken barges which were raised, but later found to be beyond repair. Appellant contends that the fact of damage beyond economic repair could and should have been determined by underwater exploration and survey before the cost of raising the sunken craft was incurred. The decisive question in this regard is whether the course followed by plaintiffs in raising the barges before examining them was reasonable in all

the circumstances. There seems to be no evidence and as a result there is no finding on this point. On remand the parties and the court will have an opportunity to address themselves to this issue as determinative whether plaintiff's salvage costs are allowable.

 We conclude that various inadequately supported or legally erroneous awards, involving substantial amounts, have been made in the determination of damages. Concerning one or more items involved in the aggregation of damages each party has asked for a chance to offer additional evidence before the trial court. Our analysis indicates that a considerable number of other questions concerning damages must be retried. And though damages as awarded to each plaintiff can be broken down into constituent items, the judgment was in the form of a lump sum award to each. All of the circumstances considered, we think it fair and preferable to vacate the award of damages and to grant an entire new trial as to damages in each case.

The findings of liability shall stand, but the judgments will be vacated to permit new trials as to damages.