658 F.2d 103
 In the Matter of the Complaint of BANKERS TRUST COMPANY As
Owner-Trustee and Monsanto Company As Chartered Owner, and
Keystone Shipping Co., As Chartered Owner and Operator of
the S.S. EDGAR M. QUEENY, for Exoneration from and
Limitation of Liability
and
VILLANEUVA COMPANIA NAVIERA, S.A., Amoco Overseas Oil
Company, and Amoco Transport Company, Third-Party Plaintiffs,
v.
BETHLEHEM STEEL CORPORATION, General Electric Company, and
The William Powell Company, Third-Party Defendants.
Appeal of VILLANEUVA COMPANIA NAVIERA, S.A., in Nos.
80-2366, 80-2444.
Appeal of B.P. OIL INC. and Sohio Petroleum Company in No. 80-2367.
In the Matter of Complaint of VILLANEUVA COMPANIA NAVIERA,
S.A., Owner of the tank vessel CORINTHOS, for Exoneration
From and Limitation of Liability, ROYAL GLOBE INSURANCE
COMPANY, Intervenor Plaintiff.
NATIONAL GRANGE MUTUAL INSURANCE COMPANY and Insurance
Company of North America
v.
BETHELEM STEEL CORPORATION and General Electric Company and
The William Powell Company, Third-Party Defendants,
v.
BRITISH PETROLEUM, LTD.; B.P. Oil Inc. and Sohio Petroleum
Company, Third-Party Defendants,
Appeal of VILLANEUVA COMPANIA NAVIERA, S.A., in Nos. 80-2366, 80-2444.
 Nos. 80-2366, 80-2367 and 80-2444.
 United States Court of Appeals,
Third Circuit.
 Argued April 22, 1981.
Decided Aug. 13, 1981.
Rehearing and Rehearing In Banc Denied Oct. 8, 1981.
 
 Richard W. Palmer (argued), Vernon C. Miller, Jr., Robert F. Russell, Palmer, Biezup & Henderson, Philadelphia, Pa., for Villaneuva Compania Naviera, S.A., appellant in Nos. 80-2366 and 80-2444 and appellee in No. 80-2367.
 Benjamin F. Stahl, Jr., Edward V. Cattell, Jr. (argued), James W. Johnson, Stuart M. Goldstein, Wm. Stanley Sneath, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for BP Oil, Inc. and Sohio Petroleum Co., appellants in No. 80-2367 and appellees in No. 80-2366.
 James F. Young (argued), Thomas Fisher, III (argued), Krusen, Evans & Byrne, Philadelphia, Pa., for Bankers Trust Co., Monsanto Co., and Keystone Shipping Co., in Nos. 80-2366, 80-2367, 80-2444.
 Before SEITZ, Chief Judge, and ALDISERT and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Villaneuva Compania Naviera, S.A. (Villaneuva) appeals from an order of the district court setting the market value of the ship CORINTHOS at $2.73 million and denying Villaneuva prejudgment interest. BP Oil, Inc. and Sohio Petroleum Company (BP/Sohio) appeal from an order of the district court denying BP/Sohio prejudgment interest and applying the legal rate of interest in Pennsylvania to the postjudgment interest award.
 
 I.
 
 2
 On January 31, 1975, the chemical tanker S.S. EDGAR M. QUEENY struck the crude oil tanker S.T. CORINTHOS in the Delaware River at Marcus Hook, Pennsylvania. The CORINTHOS, which was discharging a cargo of crude oil at the BP/Sohio terminal in Marcus Hook, exploded and caught fire. Twenty-six persons were killed, and the CORINTHOS was destroyed. In addition, the BP/Sohio terminal sustained extensive damage.
 
 
 3
 Soon after the collision, the owners and operators of the QUEENY, Bankers Trust Company, Monsanto Company, and Keystone Shipping Company (the QUEENY interests), filed a petition for exoneration from or limitation of liability pursuant to 46 U.S.C. § 183 et seq. (1976). Villaneuva, owner of the CORINTHOS, filed a similar petition a few months later. The district court bifurcated the proceedings, holding separate trials on the liability and damage issues. In its decision on the liability issues, the court denied the petition for limitation of liability filed by the QUEENY interests. It concluded, however, that Villaneuva was entitled to limited liability even though it negligently failed to use an inert gas system while unloading the CORINTHOS. The court found that an act of Congress preempted it from finding liability on this ground.
 
 
 4
 After the trial on the damage issues, the district court found that the market value of the CORINTHOS at the time of the collision was $2.73 million, not $7.98 million as Villaneuva contended. The court also found that Villaneuva's total damages were $3.07 million, and it entered judgment against the QUEENY interests in that amount. Pursuant to a stipulation between BP/Sohio and the QUEENY interests, the court also entered judgment in favor of BP/Sohio and against the QUEENY interests in the amount of $16.19 million. The court found, however, that neither Villaneuva nor BP/Sohio were entitled to prejudgment interest on the damages awarded to them. Finally, the court held that postjudgment interest would be at the legal rate of interest in Pennsylvania.
 
 
 5
 The parties filed separate appeals from the liability and damage orders of the district court, 503 F.Supp. 350 (D.C.). On May 15, 1981, a panel of this court reversed the district court's denial of the limitation of liability petition filed by the QUEENY interests. See In re Bankers Trust Co., (3d Cir. 1981); 651 F.2d 160. The panel also reversed the district court's holding that an act of Congress preempted it from finding that Villaneuva was at fault. Nevertheless, the panel found that the district court's alternative holding that the CORINTHOS was unseaworthy was erroneous. The present appeals concern the district court's damage award. We must determine whether the district court erred in (1) finding that the market value of the CORINTHOS at the time of the collision was $2.73 million, (2) denying Villaneuva and BP/Sohio prejudgment interest, and (3) awarding postjudgment interest at the legal rate of interest in Pennsylvania.
 
 II.
 
 6
 Villaneuva's damages for the loss of the CORINTHOS must be measured by the fair market value of the ship at the time of its destruction. Fair market value "is established by contemporaneous sales of like property," Standard Oil of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 467, 69 L.Ed. 890 (1925), but in the absence of such a market, a court should consider other factors to determine "the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy," id. at 155-56, 45 S.Ct. at 467. The parties agree that the district court's finding that the value of the CORINTHOS was $2.73 million on the date of the collision cannot be overturned unless it was clearly erroneous. We therefore will proceed on the assumption that Federal Rule of Civil Procedure 52(a) is applicable. We emphasize that our role when reviewing a district court's factual findings under rule 52(a) is not to "substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are 'left with the definite and firm conviction that a mistake has been committed.' " Speyer, Inc. v. Humble Oil & Refining Co., 403 F.2d 766, 770 (3d Cir. 1968), cert. denied, 394 U.S. 1015, 89 S.Ct. 1634, 23 L.Ed.2d 41 (1969) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 7
 Villaneuva contends that the district court's valuation finding was clearly erroneous because it was based upon a contemporaneous sales market established by the sale of only one ship, the GOLAR MARTITA. According to Villaneuva, the evidence established that there was no market for a ship like the CORINTHOS on January 31, 1975. Therefore, it asserts, the district court should have determined the value of the CORINTHOS by considering factors such as the amount of insurance on the ship, its reputation for dependability, its life expectancy, the opinions of qualified ship appraisers, and the value of the ship's charter. Villaneuva also argues that the district court erred even if it only used the sale of the MARTITA for comparison purposes because the MARTITA was not similar to the CORINTHOS and its sale was not an arm's length transaction.
 
 
 8
 Villaneuva characterizes the district court's reliance on the sale of the MARTITA as a finding by the court that a contemporaneous sales market for ships like the CORINTHOS existed at the time of the collision. It contends that a contemporaneous sales market cannot be established by the sale of only one ship. Cf. Barton v. Borit, 316 F.2d 550, 553 (3d Cir. 1963) (sales of like vessels must be "numerous enough to afford reliable evidence of the value of such vessels"). Villaneuva asserts that the district court erred because in the absence of a contemporaneous sales market it must consider other relevant factors.
 
 
 9
 We cannot say, however, that the district court's apparent finding that a contemporaneous sales market existed was clearly erroneous. Evidence in the record demonstrated that there was a market, albeit a poor market, for ships like the CORINTHOS at the time of the collision. The expert witnesses for Villaneuva and the QUEENY interests based their valuations on an examination of a number of sales of similar vessels close in time to the destruction of the CORINTHOS. Moreover, we believe that Villaneuva is incorrect in arguing that the district court based its valuation finding solely on the existence of a contemporaneous sales market. The court emphasized that it had to determine what the CORINTHOS "probably" could have been sold for by taking into consideration all appropriate factors. Thus, the court considered the opinions of qualified ship appraisers and the value of the CORINTHOS' charter as well as factors differentiating the CORINTHOS from the MARTITA. The district court did not expressly examine factors such as the amount of insurance on the CORINTHOS and its reputation for dependability, but we do not believe that the failure to consider these factors constituted error. Cf. Standard Oil of New Jersey, 268 U.S. at 156, 45 S.Ct. at 467 (valuation "not controlled by artificial rules;" what is required is "reasonable judgment" based on the relevant facts).
 
 
 10
 Villaneuva contends that even if a contemporaneous sales market for ships like the CORINTHOS existed at the time of the collision, the district court erred in using the MARTITA as a guide for determining the market value of the CORINTHOS. According to Villaneuva, the MARTITA was substantially different from the CORINTHOS, and its sale was not an arm's length transaction because the QUEENY interests' expert witness, a ship broker named Robert Pierot, represented both the buyer and the seller. Villaneuva argues that instead of relying on the MARTITA transaction, the court should have adopted the market value set by Villaneuva's expert witness, Eric Bates, which was based upon the sale of the THORHILD.
 
 
 11
 The district court found that the market value set by Bates was "grossly overstated" because it failed to take into account key differences between the THORHILD and the CORINTHOS. The CORINTHOS was a steam-turbine vessel, but the THORHILD was a motor vessel. As the court emphasized, rapidly escalating fuel costs at the time of the collision made the fuel efficient motor vessels more valuable than steam-turbine vessels. In addition, there was evidence indicating that the price of the THORHILD was inflated because of favorable credit terms extended in its sale. Furthermore, Pierot testified that the THORHILD was sold over two months before the destruction of the CORINTHOS, and he emphasized that the market for tankers had declined substantially during this two month period.
 
 
 12
 The MARTITA, on the other hand, was also a steam-turbine vessel, and it was sold for.$1.2 million on the day of the collision. The vital statistics of the MARTITA were generally similar to those of the CORINTHOS, and those that were different, such as age, speed, and deadweight tonnage, were considered by the district court when it adjusted the.$1.2 million sales price of the MARTITA to reach a market value of $2.73 million for the CORINTHOS. Villaneuva argues that the sale of the MARTITA "was not influenced in any way by valid market conditions" because Pierot acted as broker for both the buyer and the seller. However, there was testimony indicating that it was common in the ship brokerage business for brokers to perform such a dual function, and we do not believe that Pierot's role by itself demonstrates that the sale of the MARTITA was not an arm's length transaction. Given the evidence detailed above, we conclude that the district court's valuation finding was not clearly erroneous.
 
 
 13
 Finally, Villaneuva argues that if the district court's analysis is upheld, the market value of the CORINTHOS should be increased by over $1 million because the court's calculations were incorrect. To determine the CORINTHOS' market value, the court adjusted the sales price of the MARTITA by applying the calculation method used by Bates. Using this method, but substituting the MARTITA for the THORHILD, the court arrived at a value of $1.61 million. Because it believed that this figure understated the value of the CORINTHOS, the district court added in factors representing the differences in age, speed, and deadweight tonnage between the MARTITA and the CORINTHOS. After adding in these "enhancement" factors, the court found that the market value of the CORINTHOS was $2.73 million, over $1.1 million more than it believed the Bates method yielded.
 
 
 14
 Villaneuva notes that if the court had correctly applied the calculation method used by Bates, it would have added in age and speed in order to reach the "Bates" value, thus arriving at a base figure of $2.22 million instead of $1.61 million. As a result, Villaneuva contends that this court should correct the district court's base figure to $2.22 million and then add in the same enhancement factors used by that court. This would result in a final value of $3.74 million. Villaneuva's argument, however, assumes that if the district court had applied the Bates method correctly and reached a base figure of $2.22 million, it would have added in age and speed again to reach an enhanced value. We believe that it is more reasonable to assume that the district court intended to compensate for those factors only once in its calculations. Thus, we decline Villaneuva's invitation to "correct" the district court's calculations.
 
 III.
 
 15
 Villaneuva and BP/Sohio contend that the district court erred in failing to grant prejudgment interest on the damages awarded to them. The rule in admiralty is that prejudgment interest should be awarded unless there are exceptional circumstances that would make such an award inequitable. See, e. g., Alkmeon Naviera, S. A. v. M/V Marina L, 633 F.2d 789, 797 (9th Cir. 1980); Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir. 1980). Generally, exceptional circumstances exist only when the district court concludes that the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages. See, e. g., Alkmeon Naviera, 633 F.2d at 797-98; Mid-America Transportation Co. v. Rose Barge Line, Inc., 477 F.2d 914, 916 (8th Cir. 1973). If the court concludes that such circumstances are present, it has discretion to deny prejudgment interest. Discretion is limited to cases where exceptional circumstances exist because prejudgment interest in admiralty is compensatory, not punitive, in nature. Its purpose is to reimburse the claimant for the loss of use of its investment or its funds from the time of such loss until judgment is entered. See, e. g., Socony Mobil Oil Co. v. Texas Coastal & International, Inc., 559 F.2d 1008, 1014 (5th Cir. 1977); Utility Service Corp. v. Hillman Transportation Co., 244 F.2d 121, 125 (3d Cir. 1957).A.
 
 
 16
 In rejecting Villaneuva's request for prejudgment interest, the district court concluded that "there were exceptional circumstances in this case which prevented the prompt resolution of the claims." The court did not, however, state that this delay was attributable to Villaneuva. Instead, it stressed the complexity of the case and the necessity for extensive discovery. The court also noted that the QUEENY interests were not responsible for the delay.
 
 
 17
 Prejudgment interest can be denied only when delays in resolution of the case are directly attributable to the party claiming interest. Thus, delays resulting from the size and complexity of a proceeding cannot be charged to the claimant. See Socony Mobil, 559 F.2d at 1014. The limitation of liability proceedings filed in the district court encompassed 112 claims and involved numerous parties. As the district court apparently recognized, this was responsible for much of the delay in bringing the proceedings to trial. The court expressly found, moreover, that responsibility for the delays could not be placed upon any one party. The court emphasized that the QUEENY interests were not at fault, but this determination is not compelling because the purpose of prejudgment interest is to compensate the damaged party, not to punish the party against whom interest is awarded. See Socony Mobil, 559 F.2d at 1014.
 
 
 18
 The district court also noted that the QUEENY interests contended that Villaneuva had made a bad faith estimate of its damages. The QUEENY interests argued that Villaneuva's estimates, which ranged as high as $35 million, were greatly exaggerated and precluded any possibility of a settlement of Villaneuva's claims. The court never expressly passed upon the validity of this contention, although it did emphasize in another section of its opinion that the market value of the CORINTHOS set by Villaneuva's expert witness was "grossly overstated." We think it appropriate to construe the district court's conclusion that "there were exceptional circumstances in this case which prevented a prompt resolution of the claims" to include a determination that Villaneuva made a bad faith estimate of its damages that precluded settlement.
 
 
 19
 Villaneuva notes that its initial claim of $35 million was filed only three days after the collision occurred and was based upon an estimate of all potential personal injury and death claims that could be filed against it as well as the total loss of the CORINTHOS and its cargo. Villaneuva also emphasizes that discovery lasted over three years, and that it reduced its claim to $14.74 million when discovery was completed. By the time of the damage trial, Villaneuva's claim was $12.59 million. In addition, Villaneuva states that its final settlement offer was $7 million. The QUEENY interests maintain that these figures are not part of the record, but they do not dispute their accuracy. In fact, they argue that the figures support their contention that Villaneuva was in bad faith.
 
 
 20
 Even assuming the accuracy of the figures cited by Villaneuva, we do not believe that they demonstrate that the district court's decision was erroneous. Given the $2.73 million market value of the CORINTHOS upheld earlier in this opinion, we cannot say that the court was incorrect in concluding that the nearly $8 million valuation placed upon the ship by Villaneuva was grossly overstated. We also note that Villaneuva's final settlement offer was more than double the district court's damage award, and it is undisputed that the QUEENY interests' offered to settle for $3 million, only $74,000 less than the damage award. Even if Villaneuva's original claim of $35 million is not considered, the evidence supports a conclusion that Villaneuva's pretrial estimates of its damages were so unreasonable as to amount to bad faith and to preclude settlement. As a result, the district court's determination that exceptional circumstances existed must be upheld. Because such circumstances were present, the court had discretion to deny prejudgment interest. Although the issue is not free from doubt, we cannot say that the court abused its discretion in denying Villaneuva's claim for prejudgment interest on the total damage award.
 
 
 21
 Villaneuva also contends that it is entitled as a matter of law to interest on the value of the CORINTHOS "as a separate and distinct item of damages in lieu of lost profits." Villaneuva maintains that unlike prejudgment interest on the total damage award, interest on the value of a vessel must be granted as a matter of right in a total loss case. In addition, because such interest is purportedly a separate item of damages, Villaneuva asks this court to include interest on the value of the CORINTHOS as part of the total damage award if the district court's denial of prejudgment interest on that award is reversed.[1] Villaneuva cites a number of 19th century English admiralty cases to support its contention, but it admits that since 1874 courts in the United States have not distinguished between prejudgment interest on the value of a vessel as a separate part of damages and prejudgment interest on the total damage award. Villaneuva also concedes that modern cases have applied the exceptional circumstances standard to all prejudgment interest claims, regardless of whether they relate to interest on the value of the vessel or to other items of damages. We see no reason to depart from these cases. Thus, we hold that Villaneuva is not entitled to interest on the value of the CORINTHOS as a "separate and distinct" item of damages.
 
 B.
 
 22
 The district court stated that delays in bringing the case to trial justified its rejection of BP/Sohio's claim for prejudgment interest. The court noted that none of the parties acted with "haste," and it emphasized that there was a "constant barrage of requests by both sides for continuances and delays." The court concluded that responsibility for these delays could not be placed upon any one party. Nevertheless, it charged BP/Sohio with the delays because "the initiative is always with the plaintiff. It should want to proceed to trial in haste to recover its damages. Any delays should work to its disadvantage."
 
 
 23
 As noted earlier, delays in the resolution of a proceeding constitute exceptional circumstances only if they are directly attributable to the party claiming prejudgment interest. The district court, however, apparently charged BP/Sohio with delays attributable to all parties and to the complex nature of the proceedings solely because of BP/Sohio's status as a plaintiff. Our attention is not directed to any evidence indicating that BP/Sohio was directly responsible for these delays or that it did not diligently prosecute its damage claims. Thus, to the extent the district court concluded that exceptional circumstances were present because of delay in resolving BP/Sohio's claims, its conclusion finds no support in the record.
 
 
 24
 The district court also appears to have based its decision to deny prejudgment interest on a belief that BP/Sohio's estimate of its damages was in bad faith. The court noted that although BP/Sohio's original claim was $25.99 million, the parties stipulated that the amount of provable damages sustained by BP/Sohio was only $16.19 million. The court then concluded that the "wide variance" between BP/Sohio's original estimate and the stipulated damages justified the denial of prejudgment interest. The court did not expressly state that BP/Sohio's original estimate was made in bad faith. Although the district court's opinion is not entirely clear, we will construe its language to constitute a determination that BP/Sohio made a bad faith estimate of its damages that precluded settlement.
 
 
 25
 The QUEENY interests contend that the record fully supports the district court's decision to deny prejudgment interest on the ground that BP/Sohio was in bad faith. However, other than the "wide variance" between BP/Sohio's original estimate and the stipulated damages, there is no evidence that could indicate that BP/Sohio's statement of its claim contained spurious items or was unreasonably high under the circumstances. Cf. Patterson Terminals, Inc. v. S. S. Johannes Frans, 209 F.Supp. 705 (E.D.Pa.1962) (denying prejudgment interest because claim included damages "obviously" not caused by other party). We find that this variance is not sufficient by itself to support a conclusion that BP/Sohio acted in bad faith. BP/Sohio's original estimate was only 60.5% greater than the settlement amount, whereas Villaneuva's postdiscovery statement of its claim was almost 380% greater than the damages awarded to it.[2] Furthermore, we note that the $16.19 million awarded to BP/Sohio was the result of a settlement between the parties, not a decision by the court that BP/Sohio had suffered only that amount of damages. A settlement is by its very nature a compromise, and BP/Sohio asserts that during the course of the extensive bargaining process preceding the settlement it withdrew certain items of damages in an effort to reach an agreement.
 
 
 26
 The record also does not support a conclusion that BP/Sohio's original estimate precluded an earlier settlement of the case. Prior to the district court's denial of the QUEENY interests' limitation of liability petition, the QUEENY interests apparently were unwilling to settle for an amount above a specified percentage of the limitation fund even though they conceded that BP/Sohio had sustained at least $10 million in damages.[3] Within two months after the district court's decision on the liability issues, the parties stipulated that BP/Sohio had sustained $16.19 million in provable damages. We recite these facts not to show that the QUEENY interests were at fault, but to demonstrate that there was little or no chance of reaching a settlement on BP/Sohio's claims before the court issued its decision on the limitation of liability petitions. As a result, BP/Sohio's original estimate of its damages cannot be said to have precluded an earlier settlement of its claims. Given the compensatory purpose of prejudgment interest, we do not believe that the district court properly could conclude that BP/Sohio's original estimate of its damages constituted an exceptional circumstance that deprived it of the right to such interest. Therefore, we will reverse the district court's denial of BP/Sohio's claim for prejudgment interest.[4]
 
 
 27
 The QUEENY interests maintain that if prejudgment interest is awarded, this court should remand for further findings. The QUEENY interests argue that numerous factual issues remain unresolved, including the rate of interest and when interest should be calculated from for each item of damages. BP/Sohio asserts that unrebutted evidence on the record demonstrates that its actual cost of obtaining funds during the period between the collision and a date just prior to the judgment was 10.5%. In addition, it maintains that the record is complete with regard to the date from which prejudgment interest should run.
 
 
 28
 Undisputed evidence in the record indicates that BP/Sohio's rate of return on borrowed and invested capital during the period after it sustained its damages was 10.5%. Because prejudgment interest is intended to compensate the claimant for the loss of use of its investment and its funds, we believe that 10.5% is an appropriate rate of interest in this case. We note, however, that although BP/Sohio stated in the district court that it had sustained losses over a thirteen month period after the collision, it did not itemize the date of each loss in the evidence it presented. Such itemization is not necessary to establish the rate of prejudgment interest, which is a matter within the discretion of the court. It is essential, however, to a determination of when prejudgment interest commences because such interest is allowable only from the date of the loss of use of the claimant's investment or funds. See Mid-America Transportation Co. v. Rose Barge Line, Inc., 477 F.2d 914, 916 (8th Cir. 1973) (prejudgment interest computed from time expenditures actually made); Crain Bros. v. Duquesne Slag Products Co., 273 F.2d 948, 953 (3d Cir. 1959) (prejudgment interest not legally allowable until charges actually paid). On the record before us we cannot determine when BP/Sohio incurred specific items of loss. We therefore will remand for further proceedings on the issue of when prejudgment interest begins to run on individual items of BP/Sohio's damages.
 
 IV.
 
 29
 BP/Sohio argues that the district court erred by awarding postjudgment interest at the legal rate of interest in Pennsylvania. This court held in Gardner v. The Calvert, 253 F.2d 395 (3d Cir.), cert. denied sub nom. Sound Steamship Lines, Inc. v. Gardner, 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), that 28 U.S.C. § 1961 (1976), which sets postjudgment interest in civil cases at the legal rate of interest in the state in which the district court sits, does not apply to admiralty cases. The Gardner court noted that the rate of postjudgment interest in admiralty is "a matter within the sound discretion of the district court." 253 F.2d at 403. BP/Sohio argues that the district court erred if it believed that it was compelled by section 1961 to award postjudgment interest at the legal rate of interest in Pennsylvania. In addition, BP/Sohio contends that even if the court exercised its discretion it did so in an improper manner because it gave no reason for awarding interest at a rate more than 4% below BP/Sohio's continuing loss.
 
 
 30
 The district court stated only that "(p)ostjudgment interest shall follow the judgment at the legal rate of interest allowable in the Commonwealth of Pennsylvania." We cannot be certain from this statement that the court was aware that under Gardner it was not bound by section 1961 to apply the Pennsylvania legal rate of interest. Therefore, because we have previously decided that this case must be remanded for further proceedings, we will reverse the district court's postjudgment interest award to allow it on remand to reconsider its decision in light of this opinion.
 
 V.
 
 31
 We conclude that the district court's finding that the market value of the CORINTHOS at the time of its destruction was $2.73 million was not clearly erroneous. We also uphold the court's denial of Villaneuva's prejudgment interest claim. We find, however, that the district court erred when it denied BP/Sohio's prejudgment interest claim. BP/Sohio is entitled to prejudgment interest at the rate of 10.5%, but the case will be remanded for a determination of the time from which such interest should run. Finally, we remand to enable the district court to reconsider its decision awarding postjudgment interest at the legal rate of interest in Pennsylvania.VI.
 
 
 32
 The order of the district court will be reversed to the extent that it denied BP/Sohio's claim for prejudgment interest and awarded postjudgment interest at the legal rate of interest in Pennsylvania, and the case will be remanded for further proceedings consistent with this opinion. The order of the district court will be affirmed in all other respects.
 
 
 
 [1]
 Villaneuva calculates its claim as follows:
 
 
 [2]
 BP/Sohio maintains that it offered to settle its claim for $18.75 million two years before the damage trial, an amount only 16% above the eventual settlement figure. The QUEENY interests note, however, that this settlement offer is not part of the record. Therefore, we will consider only BP/Sohio's original estimate in determining whether the district court could properly conclude that BP/Sohio's statement of its claim was in bad faith
 
 
 [3]
 BP/Sohio states that the QUEENY interests never offered to settle for more than $3 million before the district court's liability decision. The QUEENY interests note that their pretrial settlement offer is not part of the record, but they do not dispute the accuracy of the $3 million figure. In addition, they did not challenge at trial BP/Sohio's statement that the QUEENY interests' settlement offer was "in the order of twenty-five percent" of the damages that the QUEENY interests admitted BP/Sohio had incurred
 
 
 [4]
 BP/Sohio also argues that the district court erred in failing to include in the damage award BP/Sohio's out-of-pocket costs for funds borrowed to repair damages to its facilities and to meet excess business expenses resulting from the collision. BP/Sohio raises this issue as an alternative argument: it asks for either prejudgment interest or consequential damages for its actual borrowing costs. Because we have determined that the district court erred in denying BP/Sohio's claim for prejudgment interest, we need not decide whether BP/Sohio's out-of-pocket borrowing costs should have been included in the damage award