**John CALLEN**

v.

**OULU O/Y and OY Finnlines, Ltd.**

**Civ. A. No. 87–7830.**

United States District Court,
E.D. Pennsylvania,
Civil Division.

April 7, 1989.

Charles Sovel, Philadelphia, Pa., for plaintiff.

Kevin F. Berry, Philadelphia, Pa., for defendants.

## ADJUDICATION

VAN ANTWERPEN, District Judge.

This non-jury matter is an action by a longshoreman against a shipowner for negligence. A jury trial is precluded because the shipowner is subject to the provisions of the Foreign Sovereign Immunities Act. *See* 28 U.S.C.A. § 1330 (West Supp.1988) and 28 U.S.C.A. §§ 1602–1611 (West Supp. 1988). From the non-jury trial on March 13, 1989 through March 15, 1989, we make the following findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. The plaintiff, John Callen, was born on September 22, 1925, and is presently 63 years of age. He completed the eighth grade and, after working as a busboy and in manufacturing, he served in the U.S. Navy from 1943 to 1946 and was honorably discharged. Since his discharge, he has worked as a longshoreman in Philadelphia, Pennsylvania. When his usual work unloading sugar ended in 1982, he began to report to the Longshoremen's Hiring Center under the Walt Whitman Bridge.

2. The arrangement is such that, as long as a man checks in each day at the hiring center, he is guaranteed a minimum wage which varies from year to year. For October, 1984 to October, 1985, it was $24,-000 per year and from October, 1985 to October, 1988 it was $25,000 per year. There was an increase to $25,500 per year for the 1988–1989 period. To qualify for this, a man must be available for work and a longshoreman is docked $144 against his yearly amount for each day he does not check in with the center. By 1984, plaintiff got in a pool gang which meant he would continue to report for work, but would occasionally be sent out to fill in for absent workers or when extra longshoremen were needed.

3. On December 30, 1986, the plaintiff was given a job working on the "Micofsky Gang" at Pier 80. The ship Pokkinen was docked there. The gang was handling rolls of paper and plaintiff was told to work on the No. 3 hatch lid. He entered at about 10:00 a.m. by climbing down steps which were made in the rolls of paper and went to work.

4. The rolls were being taken off as a draft by a device known as a Jensen rig. The rig is a cage which is placed over several rolls of paper and closed by pulling four lanyards shut. Plaintiff was working as a lanyard man.

5. Plaintiff was working on the tween deck in the hold in question. There is a stairway leading from the hold, but there is also a back-up ladder cut in the side of the hold. The ladder has recessed rungs in the form of pockets in the side of the hold. When the lid or hatch cover of the tween deck is folded down, it provides a deck or floor covering the lower hold of the ship. When the lid folds up accordion style, it partially covers the recessed ladder. For this reason, the tween deck lid has a similar recessed ladder built into it.

6. The recessed ladder in the lid has holes which form rungs approximately 40 cm. long by 10 cm. wide by 10 cm. deep. The entire set of holes is also recessed 1 to 1½ cm. from the main lid deck. Before the unloading on the day in question, the gang boss, Joseph Micofsky, inspected the ship and found nothing unsafe in the ship or cargo. Although nothing was said on December 30, 1986, Mr. Micofsky had warned his men about the danger of the holes on prior occasions. On prior occasions, he also noted plates which covered the recessed ladder in the lid. The plaintiff was never warned about the recessed ladder

and was unaware of its presence on December 30, 1986.

7. When the vessel was loaded overseas prior to arriving in Philadelphia, the lower hold was filled and the lower hold deck was covered with 30 cm. by 80 cm. sheets of plywood called walking boards. These boards keep the cargo away from the deck and are spaced about 5 cm. apart to provide drainage. Their placement is supervised by ship's personnel.

8. Chief Merchant Marine Officer Raimo J. Valimaki explained that the vessel in question, the Pokkinen, has four sister ships. The Pokkinen carries paper to Philadelphia about five or six times a year, and the four sister ships used to do likewise; when cargo is loaded by the stevedoring company, a representative of the paper mill is present, along with ship's officers.

9. If extra walking boards are on hand, they are put on the tween deck, although none are usually used when rolls of paper are shipped. Instead, heavy cardboard-like paper is put down on the tween deck and lid to protect rolls of paper from the hold deck and moisture and keep them clean.

·10. On December 30, 1986, this heavy paper completely covered the recessed ladder in the lid of the tween deck. Although the cargo usually causes some indentations, there was no written warning of any type on the paper of the voids formed by the steps underneath the paper. Nor was the area roped off. The ship's officers observed the unloading but gave no special warning of the location of the recessed ladder in the lid because they assumed, from past experience, that the stevedoring company knew about it. Ship's officers had warned the company about it in the past.

11. Mr. George Mara, a naval architect, reviewed the design of the ladder on the vessel in question. In his opinion, the holes in the lid pose an unsafe condition unless the slots are covered or the area is roped off. He further testified that the overall 1 to 1½ cm. recess of the entire ladder would allow the placement of a plate over the ladder area when the folding hatch cover lid is in the down position. The plate could be held in place with "J" bolts.

12. At about 10:30 a.m., after he had been working for about thirty minutes, plaintiff stepped back to pull his lanyard on the Jensen rig case which was loaded with rolls of paper. As the draft or load was lifted, plaintiff's right foot fell through the paper covering into a void caused by the ladder recessed into the lid. Plaintiff was fearful that the load might fall on him and he pulled his foot out and scrambled from underneath the load.

13. Plaintiff was in pain and after a while made his way off the ship and was driven to St. Agnes Hospital. His foot had swelled up "like a balloon". The hospital took x-rays but found no broken bones. He was sent home with an ace bandage.

14. Plaintiff went to see a Dr. Weiss and was given therapy at St. Agnes Hospital for about six months with an inflatable boot, which was supposed to force fluid out of his ankle. He continued to have problems with pain and periodic swelling.

15. Plaintiff had a previous injury to the same foot in 1973 when he fell at work on a snow-covered fire hose. He was treated by a Dr. Berman and ultimately had a sympathectomy surgical procedure. This was done to control pain and swelling. After being out for 2½ years, he returned to work. A sympathectomy can cause circulation problems.

16. Plaintiff next went to see another physician named Leonard Klinghoffer, M.D. Dr. Klinghoffer is an orthopedic surgeon and is board certified in his specialty. He first saw plaintiff on May 13, 1987 and examined him. He found no circulation problems or similar difficulties due to the sympathectomy. Tender areas were found on parts of the ankle. His diagnosis was a sprain of the right ankle complicated by prior circulation problems to an extent which rendered plaintiff disabled.

17. Dr. Klinghoffer gave plaintiff therapy with a board on his foot. This provided a reduction in calf swelling and some relief, but plaintiff remains unable to do regular longshoremen's type work. He cannot put sufficient weight on his foot to climb high

ladders and has pain when he squats. Plaintiff is presently able to do only light duty work.

18. As summed up in the physical capabilities check list (Exhibits D–1 and D–2), plaintiff can only stand four to six hours in an eight-hour day, and can squat or climb ladders only occasionally. He can sit eight hours a day, drive three to five hours a day, and walk only one to three hours per day. Plaintiff has no difficulty in using his hands.

19. Mr. Robert Wolf, who has experience and training in rehabilitation and actuarial science, has evaluated the plaintiff's condition and work categories into which he could fit. Both a history and a standard test were used. In his opinion, plaintiff is now suited only for light or medium type work and cannot work as a longshoreman. Because of plaintiff's age, work experience, education, abilities, and condition, he has no real present earning capacity.

20. Plaintiff's projected yearly earnings are $27,701 plus 37% for the employer's contribution for fringe benefits. This is a total $37,950 earning capacity for 1987 and 1988. From the date of his injury to age 65, adjusted for mortality, plaintiff would have earned $142,650. Deducting for federal, state and local income taxes, the net is $124,534. Reduced by 3% to present value after taking productivity into account and relating to the accident date, the present value of earnings and the employer's share of fringe benefits is $120,595. Although there is no formula for calculating an award for pain, suffering, discomfort, and inability to enjoy previous quality of life, we find the value of these things to be $60,000.

21. Dr. Stephen Weissman, a podiatrist, examined the plaintiff on January 5, 1989 and found the right ankle to be tender at several places and most tender at the outside of the ankle. He compared the right ankle with the left ankle and found that the range of motion in the right ankle is decreased. Dr. Weissman read the x-rays taken on December 30, 1986 and compared them with the x-rays taken February 10, 1987 and January 5, 1989. He stated that they show an arthritic condition which is progressing and growing worse. It is his opinion that plaintiff's injury on December 30, 1986 was the cause of this arthritic condition. The prognosis is not good and plaintiff cannot work as a longshoreman.

22. The accident on December 30, 1986 was the cause of plaintiff's present condition. Plaintiff's pre-existing condition resulted in the accident causing more harm than it would have caused in a person without such a pre-existing condition but the accident was nevertheless a legal cause of the condition and damages to plaintiff.

23. Plaintiff's total medical expenses are stipulated at $7,769.25.

24. The accident on December 30, 1986 was caused by the negligence of the shipowner.

## DISCUSSION

The parties have stipulated in open court that there can be no claim of contributory negligence in this case. Upon reviewing the facts, we are compelled to find that the shipowner was negligent and that this negligence was the proximate cause of plaintiff's injuries.

■■■ The shipowner observed the cargo loading operations and had a direct part in them. It clearly actually knew of the condition of the deck cover when it was shut and the risk of harm to longshoremen it posed. It had warned the stevedoring company previously about the situation. Normally, this would be sufficient to preclude liability on its part. However, in the case at bar, officers of the ship knew from observing the cargo unloading that the stevedoring company could not or would not correct the condition and the shipowner did nothing to correct or stop the stevedoring work. It clearly could have corrected this dangerous condition of the ship by installing metal plates or even walking boards over the slots in question, but it did nothing. It also could have stopped work until the area was marked in some way, but again, it did nothing. We do not mean to imply in any way that a shipowner has a duty to supervise stevedoring operations,

for it clearly does not. Nevertheless, when a shipowner actually knows of a shipboard condition which poses an unreasonable risk of harm to longshoremen and has reason to know that a mere warning to the stevedoring company is not sufficient to protect the longshoremen because the company cannot or will not correct the situation, a duty to intervene and correct the condition or stop work arises.[1]

 With regard to damages, realistically speaking, the plaintiff could not do any work because of his age and condition. He is entitled to full damages for lost wages and benefits of $120,595. Although the expert's testimony is not binding on us, we are satisfied with his testimony. Plaintiff's medical expenses amount to $7,769.25, as per stipulation of counsel. The plaintiff, who has experienced pain, discomfort and a diminution in the quality of his life, is also entitled to the sum of $60,000 for pain and suffering. Since this is a maritime personal injury case, the plaintiff is also entitled to prejudgment interest.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over this case pursuant to 28 U.S.C.A. § 1330(a) (West Supp.1988).

2. The plaintiff has brought this action for personal injuries under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950 (West 1986 & Supp. 1988). 33 U.S.C.A. § 905(b) allows for a cause of action against the vessel based upon the vessel's negligence.

3. "[T]he vessel owes to the stevedore and his longshoremen employees the duty of exercising due care 'under the circumstances.' This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property and to warning the ste-

vedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. [Citations omitted]." *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 159, 166–167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981).

4. Although safety is a "matter of judgment committed to the stevedore in the first instance," *Id.* 101 S.Ct. at 1626, there are limits to a vessel's reliance on the judgment of the stevedore. A vessel's duty to intervene and to correct the defective condition arises in the following circumstances: where the stevedore's judgment has been so "obviously improvident" that the vessel should have realized, if it knew of the defective condition and of the stevedore's continuing to work with it, that the defective condition posed an unreasonable risk of harm to the longshoremen. *Id.*

5. "The shipowner is not relieved of liability as a matter of law simply because it relied on the stevedore to correct the condition, *Lieggi* [*v. Maritime Co.*], 667 F.2d [324] at 328 [ (2nd Cir.1981) ]; *Evans* [*v. Transportacion Maritime Mexicana SS "Campeche"*], 639 F.2d [848] at 856–57 [ (2nd Cir.1981) ], or because it relied on the stevedore's judgment to proceed with the work in spite of the condition, *Lieggi*, 667 F.2d at 328; *Lopez v. A/S Svendborg*, 581 F.2d 319, 324 (2d Cir.1978). 'In such circumstances the question whether the owner's actions were negligent or not was for the jury to decide.' *Lieggi*, 667 F.2d at 328; see *Evans*, 639 F.2d at 856–57; *Napoli v. Hellenic Lines Ltd.*, 536 F.2d 505, 509 (2d Cir.1976)." *Moore v. M.P. Howlett, Inc.*, 704 F.2d 39, 42 (2d Cir.1983). In the instant case, which is being tried without a jury, the court, as the finder of fact, must decide whether the vessel's reliance on the

1. For an excellent discussion, *see* 3 Devitt, Blackmar, & Wolff, *Federal Jury Practice and* *Instructions–Civil* § 95.27 (4th ed. 1987).

stevedore's judgment constituted negligence.

6. In the instant case, the vessel knew that the ladder rungs in the tween deck floor had been hidden by the thick paper laid down as a protection against moisture in the hold. Granted that this defect had been disclosed by the vessel to the stevedore. This warning, however, had been made at some indefinite time in the past and had been made to the stevedore and not to the longshoremen. The vessel chose to rely upon the judgment of the stevedore in protecting the safety of the longshoremen who were working in the tween deck.

7. Given the nature of the hazard involved, the stevedore's expectation that the longshoremen would remember past verbal warnings about the holes and, thus, avoid them, constituted poor judgment. Here were many sizeable holes, hidden by thick paper, in a busy workplace where men had to be constantly mindful of heavy loads of paper moving up and overhead out of the hold. Actual neutralization of the hazard was necessary. To be sure, there is no duty on the part of the vessel to supervise the unloading of the vessel by the stevedore. *Scindia,* 101 S.Ct. at 1620 n. 10. In the instant case, however, the officers of the vessel had occasion to observe the stevedore's unloading of the cargo. It, therefore, should have been obvious to them that the stevedore was continuing to work despite a hazard that was still hidden and that the stevedore would not or could not remedy that hazard. The vessel, from the inception of the voyage, knew that the ladder rungs were concealed by thick paper and knew, or should have known, that such a concealed condition posed an unreasonable risk of harm to the longshoremen working on board. That knowledge, plus awareness of the stevedore's improvident conduct, should have prompted the vessel to intervene and to take measures that would have prevented harm to the longshoremen from this hidden shipboard defect. Failing this, it should have instructed the stevedore to stop work. The vessel's failure to take such action constituted negligence.

8. Among the damages to which an injured plaintiff is entitled are the following: "past lost wages, reduced by the effective tax rate; his probable pecuniary loss over the duration of his career, reduced to its present value; past medical expenses; future estimated medical expenses, if any; past and future pain and suffering; and loss of life's pleasures." *Monaghan v. Uiterwyk Lines, Ltd.,* 607 F.Supp. 1020, 1023 (E.D.Pa.1985).

9. The computation of lost wages is made up of various elements, the most significant of which is the lost wage itself. There should also be included, however, those fringe benefits accorded the worker. *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 534, 103 S.Ct. 2541, 2549, 76 L.Ed.2d 768 (1983).

10. The collateral source rule, whereby "a defendant is liable for the full extent of what the plaintiff's harm would have been in the absence of any benefits provided by another source", *Collins v. Star Warrant Shipping Co.,* No. 85–5227, slip. op. at 3–4, 1987 WL 31584 (E.D.Pa. December 31, 1987) (Pollak, J.), would permit an injured longshoreman to recover, as part of his lost wages, the value of fringe benefits normally included as part of his compensation, even if those fringe benefits were financed by the employer and payments were made directly into a separate fund. *Id.* at 4–6.

11. Pre-judgment interest, in maritime personal injury cases, should be awarded, unless there are exceptional circumstances which would make such an award unjust. The rate of pre-judgment interest is within the discretion of the court. *Monaghan,* 607 F.Supp. at 1026. Even though the Pennsylvania courts have modified the rules pertaining to pre-judgment interest, we still find *Monaghan* authoritative.

12. Exceptional circumstances exist when "the party requesting the interest has, (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precludes settlement, or (3) not sustained any actual damages. [Citations omitted]." *Matter of Banker's Trust Co.,* 658 F.2d 103, 108 (3d Cir.1981),

*cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982). Since we find no such exceptional circumstances in the instant case, the plaintiff is entitled to pre-judgment interest.

13. A foreign state which is not entitled to immunity under the Foreign Sovereign Immunities Act, 28 U.S.C.A. §§ 1602–1611 "shall be liable in the same manner and to the same extent as a private individual under like circumstances;...." 28 U.S.C.A. § 1606. Pre-judgment interest has been awarded in a case brought under the Foreign Sovereign Immunities Act. *Felice Fedder Oriental Art, Inc. and Felice Fedder v. James S. Scanlon and The United Kingdom,* 708 F.Supp. 551 (S.D.N.Y.). Were the instant shipowner a private shipowner, it would be liable for pre-judgment interest in a maritime personal injury case. Had Congress intended to preclude pre-judgment interest, it would have expressly said so as in the case of the United States under the Federal Tort Claims Act, 28 U.S.C.A. § 2674 (West 1965).

14. Since the rate of pre-judgment interest is a matter within the discretion of the court, *Banker's Trust,* 658 F.2d at 112; *Monaghan,* 607 F.Supp. at 1026, we choose to apply a rate of interest of 9%.

15. In the instant case, the plaintiff's damages amount to the following:

| | |
|---|---|
| Past and Future Lost Wages including Fringe Benefits and allowing for deduction of federal, state and local income taxes and reduced by 3% to present value | $120,595.00 |
| Past Medical Expenses, as per stipulation of counsel | $ 7,769.25 |
| Past and future pain and suffering | $ 60,000.00 |
| Sub–Total | $188,364.25 |
| Pre-judgment Interest at 9% from the date of the injury, December 30, 1986 on all past due amounts | $ 38,143.75 |
| TOTAL | $226,508.00 |

### VERDICT AND JUDGMENT

AND NOW, this 7th day of April, 1989, the court enters a verdict and judgment in favor of plaintiff, John Callen, and against defendants, OULU O/Y and OY Finnlines, Ltd., in the amount of $226,508.00.