James D. HAZZARD, Plaintiff,

v.

SOUTHERN DREDGING COMPANY, INC., and H. George Dent, Jr., (Individually and as President of Southern Dredging Company, Inc.), Defendants.

Civ. A. No. 2:90–685–18.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 29, 1993.

Paul F. Tecklenburg, Charleston, SC, for plaintiff.

W. Jefferson Leath, Jr., Charleston, SC, for defendants.

## AMENDED ORDER

NORTON, District Judge.

### I. BACKGROUND

James D. Hazzard (hereinafter "plaintiff") is the owner of a small dredge named the HAZZARD. In September of 1989, Hurricane Hugo's destructive forces rendered the HAZZARD a total loss for insurance purposes. This damage occurred while the dredge was moored at Southern Dredging Company's (hereinafter "Southern") marina in Charleston, South Carolina. Plaintiff, bringing this admiralty action pursuant to Fed.R.Civ.P. 9(h), alleges that he is entitled to the recovery of insurance proceeds from Southern, which were collected under a policy covering the HAZZARD. Plaintiff bases his entitlement on causes of actions of breach of contract, constructive trust, and unjust enrichment. In addition, plaintiff seeks actual and punitive damages against both Southern and H. George Dent, Jr. (hereinafter "Dent"), individually, under a separate cause of action

1. Plaintiff, after purchasing the HAZZARD, invested another $1000 in the dredge and then sold piling equipment for $1300. Thus, plaintiff had a total of $6000 invested in the dredge.

2. In this context, "non-portable" refers to the inability to load the HAZZARD on a truck and transport it by way of land to and from dredg-

for breach of contract accompanied by a fraudulent act.

Southern answered and counterclaimed against the plaintiff to recover expenses of storage and salvage charges incurred during the mooring of the dredge HAZZARD at Southern's marina and, in addition, claims lost profits because the sunken HAZZARD blocked the entrance to Southern's marina after Hurricane Hugo. Plaintiff replied and asserted that Southern's counterclaim fails to state a claim upon which relief can be granted. Plaintiff also asserted the affirmative defense of an Act of God being the sole cause of any loss. By Order of this court on August 14, 1991, Southern's counterclaim for storage charges was dismissed.

The case was tried before this tribunal, sitting without a jury, on September 14, 1992. Having considered the testimony and the exhibits admitted at trial, and the pre-trial briefs and proposed orders submitted to the court by the parties, this court now makes the following Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

### II. FINDINGS OF FACT

A. Plaintiff owned a dredging vessel known as the HAZZARD. Plaintiff purchased the HAZZARD on June 17, 1983, from International Paper Company for $6300.[1]

B. The HAZZARD was a small non-portable,[2] shop-built dredge built in the early 1930's. Compared to the newer, larger portable dredge models of today, the HAZZARD was extremely limited in her usefulness and power.

C. Mr. Robert Jantzen testified that the estimated value of the HAZZARD was in the range of $10,000 to $15,000, based primarily on her scrap value.[3]

ing jobs. The HAZZARD had to travel by water to any destination where it was to engage in dredging services.

3. Mr. Jantzen is a MIT graduate engineer with extensive experience in the dredging industry both in designing dredge equipment and in appraising used dredge equipment. He has had

D. Plaintiff successfully procured only two leasing arrangements for the HAZZARD prior to her demise. In 1984, plaintiff leased the HAZZARD to Ocean Isle Developing Company of Shallotte, North Carolina, for dredging at a price of $1.85 per yard, for a total of 11,500 yards or $20,350. Plaintiff's Ex. # 24. Then, in 1985, plaintiff leased the dredge to Southern for dredging at a lump sum of $15,000.

E. The leasing arrangement between plaintiff and Southern was evidenced by a lease agreement dated December 30, 1985. The lease agreement, prepared by defendant Dent as President of Southern, stated that the dredge was to be used by Southern for a dredging project on the Charleston Municipal Marina. The agreement, in the form of a letter, stated, in part:

> You [Mr. Hazzard] agree that you will furnish the dredge ... for a period of approximately 2 months....
>
> [W]e [Southern] agree that we will provide all the necessary mobilization from Georgetown to Charleston and demobilization from Charleston back to Georgetown of all of the equipment. We also agree that we will insure the dredge and equipment for $100,000 under our marine policy ... and we agree that we will replace any tools or equipment that are missing upon return of the dredge to Georgetown.

Plaintiff's Ex. # 1.

F. Plaintiff requested the $100,000 insurance coverage amount for the HAZZARD. On February 18, 1986, Southern obtained $100,000 of insurance for the dredge HAZZARD on its fleet hull policy. Plaintiff was then listed as loss payee on the policy and was, by the terms of the addendum to the policy, to remain a loss payee from February 18, 1986 to the policy expiration date of April 2, 1986. Plaintiff's Ex. # 7 and # 8.

G. Southern only used the HAZZARD for dredging services for the City of Charleston. Southern, pursuant to a modi-

fication of the marina contract with the City of Charleston and in addition to the marina dredging, used the HAZZARD for dredging of the Charleston Yacht Club area for the week of April 30, 1986 to May 4, 1986. Southern was paid $11,325 for this additional work. Plaintiff received no extra compensation for the additional use of the HAZZARD.

H. Southern completed all dredging work for the City of Charleston on May 4, 1986.[4]

I. For reasons that the parties dispute, the dredge remained in Charleston at Southern's marina for more than three years after the marina project. Southern asserts that plaintiff left the dredge at Southern in case Southern wanted to use it, for whatever reason, at no charge. Plaintiff contends that he allowed Southern to postpone return of the dredge in order to defer the cost and effort of demobilization and because Southern was considering dredging its own marina.

J. After the completion of the marina project and during the period when the HAZZARD remained in Southern's marina, Southern continued to maintain a hull insurance policy on the dredge HAZZARD. Southern, however, on the policy renewal inception date of April 3, 1987, placed the HAZZARD on a port risk basis, thereby deleting the full navigation coverage and reducing the premium charges.

K. In September of 1989, Hurricane Hugo rendered the HAZZARD a total loss. Numerous items, of value apart from the dredge, were also lost in the destruction of the HAZZARD:

| | | |
|---|---|---|
| 1. | 1200 gallon # 2 diesel E.90 | $1,080.00 |
| 2. | 1 Bbl—oil and pump | 350.00 |
| 3. | 2½" Demming booster pump | 900.00 |
| 4. | 3 b-8' collars NEW, $30.00/each | 900.00 |
| 5. | 2 swing anchors, $200.00/each | 400.00 |
| 6. | 200 lb. stainless steel anchor | 350.00 |
| 7. | Bench vice | 50.00 |
| 8. | 1½ gas pump with hose, NEW | 450.00 |
| 9. | 3 b. pipe wrench; 18 pipe wrench sledge hammers; cable cutters | 250.00 |
| | TOTAL | $4,480.00 |

Additionally, pipeline, totaling in value $7,500, was destroyed. Thus, the total val-

---

experience in appraising dredge equipment for the past eleven years and was familiar with the HAZZARD.

4. Southern's dredging services for the City of Charleston will hereinafter be collectively referred to as the "marina project."

ue of equipment lost, excluding the value of the dredge itself, was $11,980.[5]

L. The HAZZARD's sinking contributed to the blocking of Southern's marina and Rig Number 27. Rig Number 27 is a twenty-five ton floating crane.[6] Southern claims that Rig Number 27 would have been extremely beneficial immediately after Hugo in salvaging damaged vessels if it had not been temporarily blocked by the HAZZARD and claims a total of $40,000 in lost profits for this loss of use. Dent, however, testified that the HAZZARD was only "one of the items that blocked the channel."

M. Southern raised and moved the HAZZARD. Subsequent to Hugo, the HAZZARD suffered two additional sinkings—once in September of 1991 and once in June of 1992. Apparently, these sinkings were a result of the HAZZARD's poor hull condition.

N. Southern claims a total of $45,397 in handling and salvage costs.[7] Southern also claims as part of its damages the insurance premiums paid on the HAZZARD, totalling $10,949.

O. Southern collected $99,000 on the $100,000 insurance policy covering the HAZZARD.

P. In order for Southern to collect the proceeds, Dent completed and signed an "Owner's or Operator's Statement." Dent testified that he signed the statement because he considered Southern to be the "operator" of the HAZZARD for insurance purposes. He further testified that he refused to sign an affidavit of ownership.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

Jurisdiction is appropriate in this action under 28 U.S.C. § 1333, which grants federal district courts original jurisdiction in admiralty cases.

### B. Applicable Law

#### 1. Breach of Contract and Breach of Contract Accompanied by a Fraudulent Act

■ Plaintiff's first two causes of action are for breach of contract and breach of contract accompanied by a fraudulent act. These claims essentially allege that the lease entered into between plaintiff and Southern was in effect until the dredge sank on September 21, 1989. The evidence is to the contrary and shows that these causes of action must fail.

By the written terms of the lease agreement, the lease of the HAZZARD to Southern was only to encompass a two month period. The agreement specifically mentioned only the Charleston Municipal Marina project and quoted one lump sum for the rental value of the HAZZARD. The written terms of the agreement can only be read to envision a one time rental arrangement.

Deposition and trial testimony support the finding that the rental contract ended in accordance with its written terms. Plaintiff had knowledge that the lease had ended when the dredge was taken to Southern's yard after the marina project. In his deposition and trial testimony, plaintiff stated that he told Lewis H. Frampton, Jr.[8] to keep the dredge at Southern's marina in case they might want to lease it "again," indicating that he believed the lease agreement had ended. The lone agreement to delay the demobilization of the HAZZARD from Charleston back to Georgetown, regardless of the reason for the delay, does not establish any extension of the remain-

---

**5.** These values were established by plaintiff's testimony based on what he paid for the items.

**6.** Rig Number 27 also partially sank during Hurricane Hugo. After Hugo, the crane rested flat on the bottom of the marina. It was pumped out during a low tide interval and returned to its floating status in approximately a four to six hour period.

**7.** See Appendix A for an itemization of this amount.

**8.** Mr. Frampton is employed by Southern and is presently vice-president of Dredge Clinton Operations. At the time that Southern was involved with the marina project, Mr. Frampton was vice-president of operations.

ing terms of the original lease agreement. Finding no lessor-lessee contractual relationship in September of 1989 when Hurricane Hugo destroyed the HAZZARD, this court concludes that there can be no breach of the lease agreement.[9] Thus, the breach of contract cause of action against Southern must fail. Accordingly, any claim for breach of lease accompanied by a fraudulent act must also fail.

### 2. Constructive Trust and Unjust Enrichment

The plaintiff's third and fourth causes of action are for the equitable principles of constructive trust and unjust enrichment. As explained below, this court finds that the law of bailment provides an appropriate remedy at law in this case.

### 3. Implied Bailment Relationship

As the lease had terminated long prior to the loss, the relationship between Southern and plaintiff with regard to the dredge can only be seen to be that of an implied bailment. A bailment relationship can be implied by law "[w]hen possession of personal property of another is acquired and held under circumstances where the recipient, on principles of justice, ought to keep it safely and restore or deliver it to the owner." 8 Am.Jur.2d, Bailments § 64. No actual meeting of the minds is necessary. The element of lawful possession, however created, coupled with a duty to account for the thing as the property of

---

9. The agreed delay, however, did redefine the relationship between plaintiff and Southern. As explained further below, this court finds that the lessor-lessee contractual relationship between plaintiff and Southern ended with the marina project and became an implied bailor-bailee relationship upon the decision to delay the demobilization of the HAZZARD.

10. The court in *Transportation Equip. Rentals, Inc.*, 478 P.2d at 626, discussed in dicta the general rules regarding a bailor-bailee relationship and the recovery of insurance proceeds. Citing 5A Appleman, Insurance Law and Practice, § 3333, the court stated:

· The mere fact that a bailor's property is damaged or destroyed while in the possession of a bailee will not entitle him to share in any insurance taken out by the bailee.

---

another, is sufficient to constitute a bailment. *Id.* at § 54; *See also Spencer v. First Carolinas Joint Stock Land Bank of Columbia*, 167 S.C. 36, 165 S.E. 731 (1932).

It is universally recognized that a bailee in possession of the property of his bailor has an insurable interest in the goods in his possession and may insure them for full value. 8 Am.Jur.2d, *Bailments* § 137. If he does insure the goods, he may, in the case of a loss, collect the full amount of insurance. *Id.* Upon collection, the bailee either holds the surplus over his special losses in trust for his bailor or he retains the full amount of the proceeds. The trust situation occurs when the bailee procured the insurance coverage on the bailed property for the benefit, or at least part benefit, of the bailor. *See id.; See also* Couch on Insurance 2d, § 29:57. The latter situation, where the bailor can rightfully retain the full amount of the proceeds, occurs when the bailee procured the insurance for his sole exclusive benefit. *See* 8 Am.Jur.2d, *Bailments* § 137; *See also* Couch on Insurance 2d, § 29:58; *Transportation Equip. Rentals, Inc. v. Oregon Auto. Ins. Co.*, 257 Or. 288, 478 P.2d 620 (1970). Thus, the pivotal factor in deciding what interest a bailor has in insurance proceeds recovered by his bailee, under a policy procured and retained by the bailee, is in determining for whose benefit and interest the insurance on the bailed property was in fact procured.[10]

It is generally accepted that a bailee may, if he wishes, insure his bailor's interest as well as his own. When he does so, he can recover the full value of the property and account to the bailor for the excess over his own interest. The question whether a bailee has insured the bailor's interest turns on the language of the policy, and such coverage *is often found* where a policy reads 'for account of whom it may concern,' 'property held by the insured in trust or on commission,' 'property for which the insured is liable,' or other language indicating an intent to insure additional interests. The court went on to state that without such an intent, embodied in the policy language, the bailee's insurance will not be deemed to cover the bailor's interest. There is, however, other authority stating that a bailor, even in the absence of such special policy language, may have an interest in insurance proceeds recovered by

■ In its Answer, Southern urges this court to accept the proposition that it maintained the $100,000 coverage on the HAZZARD strictly for its sole benefit. Dent testified that Southern insured the dredge because of potential liability, such as environmental problems with a possible oil spill, that may have arisen while the HAZZARD was moored in its marina. Southern also relies upon the deletion of plaintiff as a loss payee on April 2, 1986, to support its position that the insurance was maintained for its exclusive benefit.

Dent, however, further testified at trial that the insurance was also being maintained in case there was damage to the dredge while it was moored at Southern's marina. Certainly any damage to the dredge would be damage to plaintiff's property; thus, a loss to plaintiff and not Southern. This court therefore finds Southern's argument that the insurance on the HAZZARD was for its sole benefit unpersuasive and unsupported in light of the facts of this case and concludes that the insurance coverage on the HAZZARD was maintained, in part, for the benefit and interest of the plaintiff.

In further support of this finding, this court takes special notice that the original lease agreement contained a provision imposing the duty of procurance of insurance coverage on Southern. Plaintiff, himself, requested the amount. There is no doubt that the original agreement of the parties envisioned insurance coverage for the partial benefit of plaintiff. Thereafter, the

lease agreement ended and the implied bailment relationship began, but the coverage on the HAZZARD remained at $100,000 and Southern, as a bailee, continued to pay the premiums and to store the HAZZARD at its marina. Furthermore, the plaintiff testified at trial that he did not know Southern continued the insurance only in its name during the three year period after the marina project and that he believed that the insurance was continued partly for his benefit. Based on the prior agreement between Southern and the plaintiff and Southern's continued course of dealings in maintaining hull insurance on the HAZZARD without interruption through the date of loss, this court finds further support in its conclusion that Southern continued to maintain the insurance, in part, for plaintiff's benefit.

### 4. Application of the "Trust Rule"

Applying the principles of bailor-bailee law as stated above to the finding that the insurance was maintained for the benefit of both Southern and plaintiff, this court concludes that Southern holds the surplus over its special losses from the sinking of the HAZZARD in trust for plaintiff.[11]

### a. Special Losses of Southern

■ This court finds that Southern has been compensated for its counterclaim damages regarding salvage costs by virtue of receipt and retention of insurance proceeds in the amount of $37,637.94.[12]

his bailee. *See id.* 478 P.2d at 628 (O'Connell, C.J., dissenting). Accordingly, this court does not find itself bound by any expressions, or the lack thereof, in the policy language and will examine the full circumstances and facts relating to this case in determining for whose benefit the insurance on the HAZZARD was procured.

11. The rationale behind the "trust rule" makes its application to this case even more logical. The danger in allowing a bailee to recover the entire amount of proceeds is that he might destroy the property in order to reap the proceeds exceeding his interest. The solution to this danger is found in the "trust rule" as described in the text above—a rule permitting the bailee to retain only that part of the proceeds representing his interest, and to require him to hold the balance as trustee for the bailor. *See Transportation Equip. Rentals, Inc.,* 478 P.2d at 628

(O'Connell, C.J., dissenting) (explaining the policy behind the "trust rule").

12. This court made the following adjustments or denied proposed adjustments to Southern's claimed damage amount of $45,397.94 as follows. Trial testimony established that Southern labor employees were paid $9.00 and $15.00 an hour. No evidence was presented to support Southern's alleged $25.00 an hour labor costs. Thus, Southern's figures were adjusted to allow $15.00 for all labor costs. Plaintiff contested Southern's claimed losses of $19,200 for post-Hugo salvaging. This court, however, finds the $19,200 salvage amount to be reasonable. The imprecision of Southern's records after the chaos of Hugo is understandable and will not bar or reduce its recovery. Southern's claim, however, for loss of use of its stiffleg derrick in

This court cannot, from the record before it, determine the contribution of the HAZZARD in the loss of use of Rig Number 27. Southern's claim of lost profits in the amount of $40,000 has not been supported by any credible evidence. Dent's trial testimony established that "other items" also blocked Southern's channel. It simply cannot be determined from the record what extent and what role the HAZZARD played in contributing to the blockage and loss of use of Rig Number 27. With various other items blocking Southern's marina after Hurricane Hugo, this court cannot, in retrospect, determine that absent the sinking of the HAZZARD, Rig Number 27 would have been free to help in the salvaging efforts immediately after the hurricane.

Based on the above, this court finds these claimed losses to be speculative. The loss of use and profits claim of Rig Number 27 is therefore denied.

### b. Proceeds Held in Trust for Plaintiff

Southern holds in trust for the plaintiff the remaining proceeds in an amount of $61,362.06.

### 5. *Prejudgment Interest*

■■■ Admiralty law governs the issue of prejudgment interest, and admiralty law provides that prejudgment interest is discretionary with the court. Prejudgment interest is designed to be compensatory and not punitive. *Matter of Bankers' Trust Co.*, 658 F.2d 103 (3d Cir.1981). Here, with a net award of $61,362.06, the plaintiff will have been adequately compensated for the loss of his dredge and attendant equipment. Where there are peculiar circumstances, such as this one, that would make it inequitable for the losing party to be forced to pay prejudgment interest, it should not be awarded. *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724

(5th Cir.1980). Accordingly, for the foregoing reasons and in the sound discretion of the court, an award of prejudgment interest is denied.

### 6. *Claims Against Dent Individually*

This court finds that no evidence has been introduced permitting the plaintiff to make any claim against George Dent individually.

### C. Amendment of Pleadings

■■■ The law of bailments was an issue not addressed by either party in the pleadings.[13] The parties' pre-trial briefs and proposed orders, however, addressed this remedy at law. Fed.R.Civ.P. 15(b) allows amendments to the pleadings to conform to the evidence. Specifically, Fed.R.Civ.P. 15(b) states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Based on Fed.R.Civ.P. 15(b), this court will allow plaintiff, upon motion, to amend the pleadings to allege the issue of bailment.

### IV. CONCLUSION

Based on the foregoing, it is

ORDERED, that the Motion to Dismiss Defendant H. George Dent, Jr. made at trial be GRANTED.

ORDERED, as to the complaint of the plaintiff, James Hazzard, against Southern

---

the amount of $5,400 is denied. Apparently, Southern placed the dredge in front of its own crane, rendering it unavailable for any other work projects, and was unable to then move the dredge away from the crane with any equipment it had.

Additionally, this court finds that Southern's expenditures for insurance premiums were part of its obligation as a bailee in keeping the HAZ-

ZARD. Thus, this court denies Southern's recovery of $10,949.

See Appendix B for an itemization of the awarded amount.

13. Plaintiff's counsel stated at trial that he would amend the pleadings if a bailment relationship was proven at trial.

Dredging Company, Inc., that this court finds for plaintiff in the amount of $61,-362.06.

ORDERED, as to the counterclaims of the defendant, Southern Dredging Company, Inc., that this court finds for defendant in the amount of $37,637.94.

ORDERED, that prejudgment interest is denied on all claims.

ORDERED, that, pursuant to Fed. R.Civ.P. 15(b), the plaintiff be allowed to amend the pleadings to conform to the evidence and to allege a cause of action for bailment.

ORDERED, that with the exception of the foregoing amendments to the judgment, the plaintiff's motion to amend the judgment and to amend the findings is DENIED.

AND IT IS SO ORDERED.

## APPENDIX A

1. *Hugo Sinking* $19,200.00
 25–ton Rig # 27
 Front End Loader (rented)
 Caterpillar Tractors (rented)
 Labor
 Environmental Clean-up
 5 days @ $3200/day = $19,200

2. *September 1991 Sinking* $11,522.94
 Labor: 72 Hrs. @ $25/hr. $1800
 Rig 27: 3 dys. @ $3200/dy. $9600
 Pump Rental $ 122.94

3. *Work done to get dredge to "float higher"* $ 4,000.00
 Labor: 32 hrs. @ $25/hr. $ 800
 Rig 27: 8 hrs. @ $400/hr. $3200

4. *June 1992 Sinking* $ 600.00
 Stiffleg Crane: 8 hrs. @ $75/hr. $ 600

5. *Other handling costs*
 July 8, 1992 $ 450.00
 Attempt to place dredge in water/hull had too many holes so raised again
 Stiffleg Crane: 6 hrs. @ $75/hr. $ 450

 July 13, 1992 $ 4,225.00
 Loading dredge on tractor/trailor
 Lift dredge/clean bilges
 Labor: 120 hrs. @ $25/hr. $3000
 Move dredge across yard
 Labor: 12 hrs. @ $25/hr. $ 300
 Stiffleg Crane: 3 hrs. @ $75/hr. $ 225
 Grove Crane: 4 hrs. @ $50/hr. $ 200
 Tractor/trailor invoice
 4 hrs. @ $100/hr. $ 400
 Austin Weston mobile crane
 2 hrs. @ $50/hr. $ 100

**SUB-TOTAL** $39,997.94

Additional claim: Loss of use of Stiffleg Derrick
 27 working days @ $200/dy. $ 5,400.00

**TOTAL HANDLING & SALVAGE COSTS CLAIMED**
**BY SOUTHERN** **$45,397.94**

## APPENDIX B

1. *Hugo Sinking* $19,200.00
 25–ton Rig # 27
 Front End Loader (rented)
 Caterpillar Tractors (rented)
 Labor
 Environmental Clean-up
 5 days @ $3200/day = $19,200

2. *September 1991 Sinking* $10,802.94
 Labor: 72 Hrs. @ $15/hr. $1080
 Rig 27: 3 dys. @ $3200/dy. $9600
 Pump Rental $ 122.94

3. *Work done to get dredge to "float higher"* $ 3,680.00
 Labor: 32 hrs. @ $15/hr. $ 480
 Rig 27: 8 hrs. @ $400/hr. $3200

4. *June 1992 Sinking* $ 600.00
 Stiffleg Crane: 8 hrs. @ $75/hr. $ 600

5. *Other handling costs*
 July 8, 1992 $ 450.00
 Attempt to place dredge in water/
 hull had too many holes so raised again
 Stiffleg Crane: 6 hrs. @ $75/hr. $ 450

 July 13, 1992 $ 2,905.00
 Loading dredge on tractor/trailor
 Lift dredge/clean bilges
 Labor: 120 hrs. @ $15/hr. $1800
 Move dredge across yard
 Labor: 12 hrs. @ $15/hr. $ 180
 Stiffleg Crane: 3 hrs. @ $75/hr. $ 225
 Grove Crane: 4 hrs. @ $50/hr. $ 200
 Tractor/trailor invoice
 4 hrs. @ $100/hr. $ 400
 Austin Weston mobile crane
 2 hrs. @ $50/hr. $ 100

**TOTAL HANDLING & SALVAGE COSTS**
**AWARDED TO SOUTHERN** **$37,637.94**